### WILLIAM H. SABIN *v.* BANK OF WOODSTOCK.

By a provision in the charter of the Bank of Woodstock, no transfer of stock in the bank was to be valid, unless recorded in a book to be kept by the bank for that purpose, and unless the person making the same should have previously discharged all debts due from him to the bank. In October, 1835, one S., who was the owner of nearly two hundred shares in the capital stock of the bank, and who was not then indebted to the bank, transferred his stock, in due form, upon the book of the bank, to forty five different persons, without consideration, and for the purpose of increasing the vote upon his stock at an approaching election of bank officers; and by this transfer four shares were conveyed to the plaintiff. Nearly all of these shares, but not those conveyed to the plaintiff, were re-conveyed to S. by the persons to whom they had been transferred; and on the ninth of October, 1837, he made a similar distribution of his stock, by transfer in due form upon the book of the bank, for a similar purpose, and at this time transferred to the plaintiff two shares. S. was at this time indebted to the bank to an amount exceeding the value of all the stock owned by him. The plaintiff had no interest in the six shares, which stood in his name, until October 25, 1837, when he purchased them of S. in payment for pre-existing debts. On the sixteenth day of November, 1839, the bank attached these six shares, as the property of S., upon a debt which accrued January 6, 1837, and caused them to be sold on execution, to satisfy said debt, December 19, 1840. From the time the transfers were made upon the book to the plaintiff until the time of the attachment S. controlled these six shares, as well as the others transferred by him, as his own property, and he received all the dividends upon them which were paid previous to the attachment; and the plaintiff made no claim upon the bank until 1841, when he demanded the dividends, and one dividend, which became due previous to the sale on execution, was paid to him, and payment of those which accrued after the sale was refused. And it was held, that the plaintiff, having suffered S. for so long a period to treat the shares as his own, was bound to inquire of the bank as to the state of the title, before purchasing, and to give notice to the bank of his having become the beneficial owner, and that his title, as between him and the bank, could only be regarded as accruing from the time such notice was given, and that the bank, having attached the shares previous to receiving such notice, was entitled to hold their avails, as against the plaintiff.

And it was also held, that it made no difference in the case, that a majority of those who were the directors of the bank advised or procured the transfers to be made by S. upon the book of the bank. As directors they would have no right to make or advise such operation.

But *bona fide* purchasers of stock, without notice, are at liberty to act upon the faith of the title being where upon the books of the bank it appears to be. REDFIELD, J.

45

INDEBITATUS ASSUMPSIT for money had and received. Plea, the general issue, and trial by jury, May Term, 1848,—REDFIELD, J., presiding.

On trial the facts appeared as follows. By the ninth section of the act of incorporation of the Bank of Woodstock, the defendants, passed in 1831, it was enacted, " That the shares in said bank ' shall be transferable in such manner, as shall be prescribed by the ' by-laws of said corporation ; Provided, That no transfer shall be ' valid, until the same shall be recorded in a book to be kept by the ' directors, in said bank, for that purpose, and unless the person ' making the same shall have previously discharged all debts due ' from him or her to said corporation." On the ninth day of October, 1835, Elisha L. Sabin, who was then the owner of a large number of shares in the capital stock of the bank, and who was not then indebted to the bank, transferred upon the book of the bank, in due form, to forty five different individuals, among whom was the plaintiff, one hundred and eighty shares of the stock ; which transfers were made without consideration, and for the only purpose of increasing the vote upon the stock at an approaching election of bank officers. By this transfer four shares were conveyed to the plaintiff. Nearly all of these shares, but not those conveyed to the plaintiff, were re-conveyed to said Elisha by the persons to whom they had been transferred ; and afterwards, on the ninth day of October, 1837, at the request of a majority of the persons who were then directors of the bank, the said Elisha made a similar distribution of his stock, for a similar purpose, and without consideration, to a large number of persons, among whom was the plaintiff, which transfers were also made in due form upon the book of the bank ; at this time there were transferred to the plaintiff two shares ; and the said Elisha retained standing in his own name forty one shares. At the time of this transfer, and for some time previous, Elisha L. Sabin was indebted to the bank in an amount exceeding the value of all his stock in the bank, including what stood in his own name and all that he had so transferred ; which indebtedness was never satisfied, except by a sale of the stock upon execution, as hereinafter stated. In the summer of 1837 Elisha L. Sabin became indebted to the plantiff for wool purchased of him, and on the twenty fifth of October, 1837, he sold to the plaintiff the six shares, which then

stood in the plaintiff's name, for $150, which sum the plaintiff indorsed upon the note which he held against the said Elisha for the wool. On the sixteenth day of November, 1839, the bank attached the six shares, which stood in the plaintiff's name, as the property of Elisha L. Sabin, upon a debt which accrued January 6, 1837; and on the nineteenth of December, 1840, they caused these shares to be sold on execution, to satisfy said debt, and received the amount for which they were sold. From the time the transfers to the plaintiff were made upon the book of the bank until the time of the attachment, Elisha L. Sabin controlled these six shares, as well as all the others transferred by him, as his own property, and he received all the dividends, which were paid upon them previous to the attachment; and the bank, during this time, dealt with said Elisha upon the faith of his being the owner of all the stock which had been so transferred by him, and without any intimation, from any one, that the plaintiff had any interest in the stock, until after the attachment; and no dividends were called for by the plaintiff until 1841, when he demanded the dividends which had accrued, and one dividend, which accrued prior to the sale on execution, was paid to him, and payment of the dividends which accrued after the sale was refused.

Upon these facts the county court decided, that the plaintiff was not entitled to recover, and directed a verdict for the defendants. Exceptions by plaintiff.

*P. T. Washburn* and *C. P. Marsh* for plaintiff.

At common law the transfers upon the book of the bank, made October 9, 1835, and October 9, 1837, being made without consideration, were invalid as to creditors; and the bank, becoming at any subsequent time a creditor, would stand upon the same footing, in this respect, with any other creditor. But the object of the provision in sec. 9 of the charter was to give the bank a more direct and specific remedy, by enabling them to control the passing of the legal title to the stock by way of transfer. An assignment of shares in due form would be good, as between the parties, though not recorded. If no debts were due from the assignor to the bank, the bank could be compelled to open their books, to allow the record to be made. If such debts were due, the only effect of sec. 9 is, to provide that

the bank shall not be compelled to record nor recognize a transfer, until such debts are paid,—thus giving them a *lien* upon the stock for the debts due from the ostensible owner. They have a *right*, then, to give credit to a man for the stock standing in his name upon their books, and rely upon the *specific lien* given by their charter ; or, if they believe a man owns stock, which does not stand in his name, they may still give him a credit upon faith of it, but they cannot assert their *specific charter lien*, but must rely upon the same common law remedy by attachment, which is open to all other creditors.

This was precisely the condition of things after the transfer of October 9, 1835. That transfer was valid as to the bank, because it was both recorded and made in the absence of all indebtedness to the bank; it was good between the parties at common law. By this act the *shares were transferred*, within the meaning of sec. 9, and nothing remained to Elisha L. Sabin but an equitable interest in the shares, which his creditors could hold, as against the plaintiff. The transfer of this *equitable interest* was not required to be recorded; but of two creditors, one acquiring a title to this equitable interest by purchase for a valuable consideration, the *other* by attachment, the first in time would be first in right. The transfer actually made upon the book was the one contemplated by sec. 9,— was the only one required to be recorded,—and was the only one, which the bank, or third persons, were bound to inquire after, or recognize. Act of incorp., sec. 16. St. of Nov. 11, 1841, [Acts of 1841, p. 16.] *Davis v. Bank of England,* 2 Bing. 393, [9 E. C. L. 444.] *Ashley et al. v. Million Bank Co.,* Ambl. 503. *Northrop v. Newtown and Bridgeport Turnp. Co.,* 3 Conn. 551. *Agricultural Bank v. Burr,* 24 Maine 256.

The result would seem to be, that the bank can assert no *specific charter lien* upon any *equitable interest* in shares,—but only upon the legal title, as shown by the books ; and that, when they have permitted a transfer upon their books, according to their rules in the absence of any lien, they can never claim a lien by virtue of a subsequent indebtedness to them, but must give credit upon the faith of their common law remedy by attachment; and a lien by attachment is the only lien, which a subsequent purchaser for value is bound to inquire after, or notice.

But the plaintiff insists, that he is also entitled to recover for the two shares, which were transferred October 9, 1837. The transfer of these two shares was recorded; and so the first clause in the proviso to sec. 9 is complied with. Although the language of the second clause is, "that no transfer shall be valid," &c., yet the legal effect of the provision must be merely to render the transfer *voidable* by the bank. That such is its effect is obvious from the consideration, that a transfer in due form must be valid, as between the parties to it; and if a debt existed against the person making the transfer, a subsequent payment of that debt would render the transfer valid; and the purchaser would have the right to pay, or tender, the amount due to the bank, and might compel the bank to record the transfer. *Bank of Utica* v. *Smalley*, 2 Cow. 770. *Quiner* v. *Marblehead Social Ins. Co.*, 10 Mass. 476. *Sargent* v. *Franklin Ins. Co.*, 8 Pick. 98.

As the transfer would be valid, subject to the rights of the bank as creditors, and as the provision is merely for the security of the bank, it follows, that the bank might waive, or dispense with the lien, and a purchaser with such waiver on their part would hold. *Union Bank* v. *Laird*, 2 Wheat. 390. If the purchaser have notice of the indebtedness, yet if he purchase upon an express waiver on the part of the bank, he would hold; if he have no such notice, but the purchase is made with the assent of the bank, he would be warranted in presuming, either that no debt existed, or that the lien was waived. If one had purchased this stock of the plaintiff, for valuable consideration, without notice of the original purpose of the transfer, he would have held it, discharged of the lien. And the plaintiff, in purchasing from Elisha L. Sabin his equitable interest in the shares, without knowledge of his indebtedness to the bank, (and no such knowledge is pretended,) would stand upon the same footing;—he might presume, from the fact that the transfer had been recorded, that it was made with the assent of the bank, and that no such indebtedness existed.

But it is shown, that the transfer of October 9, 1837, was made with the express assent of the directors of the bank, and by their directions. This was a direct *waiver* of their lien; and it cannot be now asserted, as against the plaintiff, without working upon him a fraud. The directors, by the charter, are invested, in the most

Sabin *v.* Bank of Woodstock.

general terms, with power to manage and control the business and securities of the bank. At all events, if the directors suffer a transfer, and a purchaser buy without knowledge of the indebtedness, (as did the plaintiff,) the bank is bound by the act of the directors, on the ground of the fraud which would otherwise be practised on the purchaser.

*Tracy & Converse* and *O. P. Chandler* for defendants.

The lien created by virtue of sec. 9 of the charter attached to the shares while Elisha L. Sabin was owner. It could make no difference, whether they stood in his name, or not. This lien was as effectual as any that could be created by attachment, or in any other way. Act of Incorp. sec. 9, 16. The bank had no control over stockholders, to prevent their transferring stock upon the books. The lien would continue, and the bank might continue to treat Elisha L. Sabin as the owner, until notice to the contrary by a *bona fide* purchaser, notwithstanding the transfer on the books. *Partridge v. D. College,* 5 N. H. 286. Yelv. 67, note. *Owenson* v. *Morse,* 7 T. R. 74. *McDaniels* v. *Colvin et al.,* 16 Vt. 300. The plaintiff was bound to know of the lien of the bank ; and the taking a transfer of the title, without giving the bank notice, was a fraud. *Heartt v. Chipman et al.,* 2 Aik. 162. The bank, at all events, had the prior equitable lien, and should prevail. *Walker* v. *Sargeant,* 14 Vt. 247. The request of the directors could amount to nothing. They acted as individuals, and did not profess to act in the capacity of directors. If they had professed to act as directors, they had no power to affect the interest of the bank by such request. They had no authority to order stock distributed for electioneering purposes. Act. of Incorp. §§ 5, 7, 12, 21. But if the directors had authority to bind the bank in this matter, to what did they bind it ? And what was understood to be the effect of the direction ? Surely nothing more, than that Elisha L. Sabin distributed his stock for the time being, still retaining the ownership, and the stock to be re-conveyed to him immediately after the election, as it had before been done. There was no intimation, that he was in that way to part with the owership, or the bank with their lien. The provision creating the lien was not designed merely for the interest or benefit of the bank, but for the safety of all who might hold their bills.

The opinion of the court was delivered by

REDFIELD, J. The important facts in this case are, briefly, that Elisha L. Sabin, a brother of the plaintiff, owned, in October, 1835, nearly two hundred shares in the capital stock, and was not indebted to the bank. At that time, and for the purpose merely of increasing his vote, in the election of bank officers, he conveyed one hundred, and eighty shares to forty five different persons, taking from them proxies for the purpose of voting in their names. From that time forward, until the defendants attached the shares, on the 16th day of November, 1839, Elisha L. Sabin continued to control the shares, as his own property, without any intimation from any source, that they were not in fact exclusively so. During this time Elisha L. Sabin had obtained of the bank large credits, upon the faith of his being the owner of this stock. Most of the shares had, in the mean-time, been reconveyed to Elisha L. Sabin; but the plaintiff's four shares, or those conveyed to him, had remained on the books of the bank in his name. The debt, upon which the defendants attached the shares, accrued on the 6th of January, 1837.

On the 9th of October, 1837, Elisha L. Sabin again distributed his stock in the same manner, and for the same purpose. At this time he was indebted to the bank in a larger sum than all his stock, which has never been satisfied, except by a sale of the stock. At this time two additional shares were conveyed to the plaintiff. The plaintiff had no interest whatever in these six shares, (which were sold by the bank as the property of Elisha L. Sabin, and to pay his indebtedness to the bank, and upon execution, on the 19th day of December, 1840, and which are in controversy in this suit,) until the 25th day of October, 1837, when he took them of his brother, in payment of debts he had against him.

That portion of the charter of the bank, by which the defendants claim to hold these six shares, as the property of Elisha L. Sabin, is as follows: " That the shares in said bank shall be transferable, in such manner as shall be prescribed by the by-laws of said corporation. Provided, that no transfer shall be valid, until the same shall be re-corded in a book, to be kept by the directors, in said bank, for that purpose, and unless the person making the same shall have previ-ously discharged all debts due from him or her to said corporation."

The last transfer made by Elisha L. Sabin, October 9, 1837, was

made at the suggestion of persons, who were at the time directors of the bank, and who constituted a majority of the board, but acting separately, but for the common object of securing their own reelection. These transfers were all recorded upon the books of the bank in due form.  Elisha L. Sabin received all the dividends upon these six shares, which were paid before the sale upon execution.  And the plaintiff made no claim upon the bank until 1841, when there remained one dividend upon these shares, prior to the sale, unpaid, which was then paid to the plaintiff, he at the time making demand of the subsequent dividends, (after the sale,) which the bank refused to pay.

The question to be determined is, whether, under this state of facts, the plaintiff is entitled to hold the six shares against the bank. This will depend upon the question, at what time the plaintiff's title is to be regarded as accruing, as between him and the bank.

We should not be inclined to question, that a *bona fide* purchaser of shares of one in whose name the shares stood on the books of the bank, and who was not himself indebted to the bank, would acquire good title to the shares, as against the world.  Such seems to be the rule laid down in the English cases, cited in argument, even when the transfers have been made by virtue of forged powers of attorney. This is done to give greater security to that species of property, and is really for the advantage of the banks, inasmuch as the value of the property depends somewhat upon the perfect security of the title. It is also esteemed somewhat culpable, in the officers of such a corporation, to suffer a transfer of stock to be made upon their books, by means of a forged power, when it is supposed they possess readier means of detecting the genuineness of the handwriting as well as of the other transactions of their shareholders, than strangers have. So that one who purchases stock in these corporations is not obliged to look beyond the books of the bank, for the evidences of title, and if he purchases upon that appearance he is entitled to receive the dividends of the bank.  They, too, would be liable also to pay the dividends to the true owner, if they had suffered the transfer to be entered upon their books upon insufficient authority.  This is substantially the rule of the English courts, and of many of the American states, and of the national courts.  The opinion of TANEY, Ch. J., in *Lowry* v. *The Commercial and Farmers' Bank of Baltimore,*

Sabin *v.* Bank of Woodstock.

in the circuit court, decided in July, 1848, which we have not seen, except as reported through the newspapers, is to the same effect, if we correctly apprehend its principle. That was the case of a transfer, suffered by the bank, through the agency of an executor, who, by the will, was not authorized to make the transfer. The court held, that the bank was bound to look into the will, for the purpose of learning the extent of the executor's authority, and were culpable for not doing so, and chargeable with implied notice of the contents of the will.

But it does not seem to us, that the present case comes within this principle. The great question here is, whether the plaintiff was at liberty to purchase these shares, upon the faith of the formal title merely being in himself; or whether, having for years suffered the former nominal owner, and in fact the real owner, to treat the stock to all intents as his own, he was not bound to make inquiries, as to the state of the title, before he purchased, and, after he purchased, to give notice to the bank of his having become the beneficial owner, before he could compel the court to protect him as such? It seems to us, that such was his duty.

We do not, indeed, feel prepared to say precisely how far such merely formal transfers upon the books of the bank, and for the purpose of defeating the proper objects of the charter, in one particular, are to be regarded as of any force whatever, as to those who are instrumental in bringing them about. Reason and policy and justice would seem to require, that they should be treated as simply void. But certainly the plaintiff had no reason to expect, that the bank would deal any differently with his brother, on account of any such mere shadow of a transfer, while he was all the time receiving the dividends, and treating the stock, to all intents, as his own, which it in fact was. Nor can it be supposed, that any honorable man would act upon any such expectation. We think, therefore, that his title must date, as between himself and the bank, from the time they had notice of such title.

And the fact, that certain persons, who formed the majority of the board of directors, advised this distribution of the stock, can, in our apprehension, make no difference. As directors, they had no right to make or advise any such operation. It was not supposed by any one, that, as directors, they had any such authority, or that they

professed to act upon any such ground.   We think, therefore, that all the plaintiff's shares must be considered as standing upon the same ground.   So far as the bank was concerned, at the time of the attachment and sale, the title was in Elisha L. Sabin. ·

It is, perhaps, not necessary to go farther.   We entertain, however, upon the present argument, no reasonable doubt, that the mode of transfer of stock pointed out in the charter is the only mode, which the public are bound to regard as conveying the title.   All persons, unaffected with notice to the contrary, are at liberty to act upon the faith of the title being where it appears upon the books of the corporation to be.

This view we do not think  inconsistent with the notion, that any other mode of conveyance may be perfectly good, between the parties to it, and to all others having notice of it, the same as an unrecorded deed, or notice of a mere equity.

It seems to us reasonable to  conclude, that the  defendants, as a corporation, under their charter, might refuse to allow the transfer of stock to go upon their books, until all debts due from the grantor, or seller, to the bank were paid.   Indeed, this seems the only mode in which they could enforce their lien against the title of a *bona fide* purchaser.

But if a formal transfer of stock were made upon the books of the bank by mistake, or in any other way, not intending to *convey title,* we do not think one who had knowledge of that fact would acquire any title, as against a *bona fide* owner, or pledgee, by purchase of the person in whose name the stock stands.   These are, we believe, but elementary principles in the law, as they certainly are in reason, justice, and morals.                                    Judgment affirmed.