## CHAMPION *vs.* WILSON & COMPANY.

1. A contract made and to be performed in New York, will be enforced by the courts of this state according to the legal status it would occupy in New York, and if illegal there, it will be held to be illegal here; but the law of that state must be put in evidence before it can be applied in this state, and unless in evidence before the superior court according to the record, the judgment of the superior court thereon will not be reviewed by this court.

2. Where certificates of stock in a corporation are deposited as collateral security, having an indorsement upon them importing a power to transfer, or of having a transfer made on the books of the company, and the transfer is actually made some time thereafter to the parties who held the certificates as collateral, and new certificates are issued to said parties, the same was not wrongful if it was such a transfer as the power authorized, but if it was not such as the power authorized, it was wrongful. If the terms of the power be ambiguous, or if the indorsement be blank, the true meaning may be ascertained by the assistance of all the surrounding circumstances.

3. Whilst, in order to make the custom of any trade or business binding, it must be of such universal practice as to justify the conclusion that it became, by implication, a part of the contract, yet it need not be absolutely universal without a single exception in the business or trade; it need not be so universal as to embrace every transaction of the sort; it is enough if it be so usual, so customary, so generally practiced by those engaged in the business, that exceptions here and there will only serve to establish the habit of the trade.

4. Where the defendant is sued as an individual, recovery cannot be had against him as a partner; and if he set up a contract with plaintiffs whereby they agreed, for a consideration, to relieve him from

Chanpion *vs.* Wilson & Co.

liability and look to a partnership for payment of his indebtedness to them, it cannot be replied in a suit against him individually that he is a member of that partnership; and a charge to that effect is erroneous.

5. The evidence being conflicting, and not requiring the verdict independently of error in the charge, a new trial should be granted, especially in a voluminous case, involving the application of intricate and important legal principles to complicated facts.

Contracts. Laws. Collaterals. Stock. Evidence. Custom. Partnership. New trial. Before Judge SIMMONS. Bibb Superior Court. April Term, 1879.

Wilson & Company sued Champion on an account for money advanced by them for the purpose of purchasing " cotton futures " in New York for him, and for commissions due for making such contracts, etc.

Champion pleaded as follows :

1st. That it was a contract governed by the laws of New York, and was null and void under the laws of that state against betting, etc.

2d. That before the advances were all made, he deposited stock of the South Carolina Railroad Company with Wilson & Company, which was worth about $14,000.00 more than he owed them when their account fell due, and that, according to the general custom in New York, it was the duty of Wilson & Company to have sold said stock for their reimbursement within a reasonable time after said account became due ; that the stock has now become worthless, or nearly so.

3d. That Wilson & Company did, in fact, without the knowledge of Champion, convert said stock by applying to the company and having new certificates of stock issued to them in their own name, and surrendering to the company the certificates belonging to and deposited by Champion, and that when this was done said stock was worth several thousand dollars more than Wilson & Company's claim against him.

4th. That some time after this account had matured, Wil-

son & Company (who held a similar claim for a much larger amount against W. L. Ellis & Brother) applied to him through Ellis & Brother to allow them to transfer his account to that of said Ellis & Brother, and to let them hold his stock as collateral security for the whole account so merged, they (Wilson & Company) looking to Ellis & Brother, and not to Champion, for the payment of the entire indebtedness. To this, for a special consideration agreed on between Champion and Ellis & Brother, Champion consented ; that when this arrangement was proposed and agreed to, Champion's stock was worth some $12,000.00 or $14,000.00 more than his individual account amounted to, etc.

The evidence was conflicting on almost all the points in issue, especially in regard to the custom of New York brokers in connection with collaterals. It was also claimed by plaintiffs, and denied by defendant that he was a partner of Ellis & Brother in these transactions.

The jury found for plaintiffs. Defendant moved for a new trial on the following, among other grounds :

(1). Because the court refused. to charge the following request : "The law of New York governing this case makes void a contract where a broker there was employed to purchase for another what are known as ' cotton futures,' provided the evidence satisfies the jury that such ' cotton futures' were known at the time by both parties as simply a wager or speculation on the rise and fall of the price of cotton."

(2). Because the court refused to charge the following request : " If plaintiffs, without the knowledge of the defendant, surrendered to the South Carolina Railroad Company certificates of the stock of that company which had been deposited with the plaintiffs as collateral, and applied for and obtained from said company new certificates for the same amount of stock in said company, issued to and in the name of said plaintiffs, this was a conversion of the stock so deposited, and charged the plaintiffs with the value of said

stock at the time said new certificates were issued to the plaintiffs, unless defendant, after knowing of said conversion, waived his right to charge the plaintiffs with the then value of said stock."

(3). Because the court charged as follows: "If you believe from the evidence that such was the universal custom (*i. e.* to sell collaterals to pay losses when they occurred), then it did enter into the contract, and plaintiffs should have sold to protect themselves. The custom must have been universal; it must have been the custom in every transaction of this sort in New York. If some merchant or broker in New York failed to carry out this custom, then it was not a universal custom. Universal means the whole—every one. It differs from the general custom. General means the majority or greater number. If you believe from the evidence that it was not a universal custom, then it did not enter into the contract, and the plaintiffs were not compelled to sell on the happening of the loss."

(4). Because the court charged as follows: "The plaintiffs say that if you believe that such a merger (of defendant's liability into that of Ellis & Brother) was agreed upon and carried into effect, that the defendant is still liable, for they say that he was either a partner of Ellis & Brother, or held himself out to them that he was a partner, or acted in such a way that he induced them to believe that he was a partner. You have heard the evidence in this case, and must say whether he was a partner or not, or whether he acted in such a way as to make them, the plaintiffs, believe that he was a partner. If you believe from the evidence that he was a partner, or acted so as to make plaintiffs believe that he was a partner, then if the merger of the account did take place, it does not relieve Champion from his liability, if he was originally liable."

(5). Because the verdict was contrary to law and the evidence.

The motion was overruled, and defendant excepted. For the other facts, see the opinion.

LANIER & ANDERSON, for plaintiff in error.

JNO. P. FORT; N. J. HAMMOND, for defendants.

JACKSON, Justice.

In this case Wilson & Company sued Champion for money expended by them for him in the purchase of cotton futures in the city of New York, where the contract was made and where it was to be executed. A verdict was rendered for the plaintiffs, a motion was made for a new trial on many grounds, it was overruled, and the defendant excepted.

There are many grounds set out in the motion, but all were abandoned or not urged here except a few which we proceed to consider.

1. The contract being made and to be carried out in New York, it is urged that New York and not Georgia law should prevail, Code, §8; 38 *Ga.*, 132; 40 *Ib.*, 553; but the defendant gave to the court below no evidence of any law of New York so far as the record discloses. In order to take a case out of our own law, there must be evidence before the court that tried the case of the law of the other state, and the record must show its introduction in evidence. It does not appear from this record to have been introduced as evidence at all. Probably the law of this state, if the contract had been made and was to be performed here, would uphold it. 45 *Ga.*, 501; 59 *Ib.*, 25. Possibly the facts here, as insisted upon by the defendant in his testimony, might make a case too strong and too much akin to betting for our own statute, and might take this case out of the principle controlling those. See Code, §2638. If it were an original question, one might well hesitate.

However this may be, the law of New York entered into this contract, as it was made and was to be executed there, and our courts will enforce it, whatever it may be; and this contract must stand or fall as the test of that law is applied to it. But as it was not before the superior court, we cannot review any judgment of that court thereon. That court

said nothing about it—perhaps for this reason. 57 *Ga.*, 371.

This disposes of the requests to charge the New York law, and to apply it here. When so applied it becomes, as the law of the contract, Georgia law; and it matters not where it came from. For this case—*pro hac vice*—it is our own law. 38 *Ga.*, 129; 54 *Ib.*, 613. Still, to make it our law, it must be in evidence before the court.

2. But it is insisted further by the defendant, that he placed certain collaterals, consisting of railroad stock certificates, in the hands of the plaintiffs, and they changed the title and converted them to their own use, and are responsible for them at their value when converted. If the plaintiffs did convert them without authority, they are certainly responsible for their value at the date when they appropriated them. So that the question is, did they convert them?

The collaterals were certificates of stock in the South Carolina Railroad Company, issued to Zeilin & Company, who seem to have turned them over to defendant to be used with plaintiffs, to cover the margin for the purchase of cotton contracts for futures, and some sort of power or authority to transfer seems to have been indorsed in blank thereon. These certificates were given as collateral to plaintiffs in September, 1871, and in October, 1872, they were given up by them to the railroad company, the stock was transferred to plaintiffs, and new certificates were issued to them. This may have been done to guard against third persons acquiring rights without notice, and to protect the stock against such liens acquired by others; or it may have been an assertion of absolute title, as possibly the collaterals, as margin, were exhausted. There is some reason and authority perhaps justifying some such step to guard against loss—see People's Bank of Bloomington *vs.* Gridley, supreme court of Illinois, reported in Albany Law Journal, August 8, 1879, p. 123. Ordinarily, however, between the parties themselves, the assignment and delivery of the certificates of stock alone would guard the rights of the pawnees. See 1 Am. Railway Cases, 110; Redfield on

Bailment, 659–674; Story Eq. Jur., 412–421, and note; 3 Hill, N. Y., 228; 5 Gray, 373; 21 Verm., 353; 6 Conn., 558; 42 N. H., 424; 29 Penn. St., 146; 13 Conn., 498; 49 Me., 315; 34 *Ib.*, 256; 9 Rh. I., 308; 12 Gray, 213; 17 Ill., 86; all cited in the Albany Journal case.

But it is impossible to adjudicate this point from the evidence in this record. The power to assign or transfer is not here. That is the instrument on the construction of which this point must turn. Did it authorize the plaintiffs to change the title on the books and to take the new certificates? It is not in evidence, nor is it described by its contents, so that we can see what authority it gave to plaintiffs. True, if ambiguous or blank, it ought to be construed in the light of all the facts of this case, but without the power itself we grope in the dark. It looks singular that the plaintiffs should have been content to have held the old certificates, with the indorsement thereon for over twelve months, and then make the change. Did they have the power by the indorsement or transfer on the old certificates? If the indorsement gave them the power so to act, the transfer on the books and the new certificates to themselves were not wrongful; if it did not, they were wrongful; if ambiguous or blank, then all the circumstances may aid. Did Champion know of its exercise? Was it done to secure themselves against third parties *bona fide* towards Champion, or to take absolute title as owners without regard to his rights? Why not have the transfer made and the new certificates made to them for the use of Champion or of Ellis & Brother, as their version is that the stock was always held for Ellis & Brother also? But the great question is, did they have the power? and without the instrument relied on to give it, we cannot move, for if they had it from Champion, his mouth is closed.

3. The charge was not right on custom. True, our Code says, par. 1, sec. 4, that "the custom of any business or trade shall be binding only when it is of such universal practice as to justify the conclusion that it became, by im-

plication, a part of the contract;" but this cannot mean, as the court charged, that it must have been followed "in every transaction of this sort in New York." For then one act of one broker would defeat a custom universal but for that act. Nor does it mean "the whole—*every one*," as the court reiterates; but it means, what it says, of such universal practice as to imply that the trade would understand that it went into the contract. It must be rather more than general—much more than the habit of a majority; but not absolutely unbroken by one single transaction of one tradesman. Such a rule would defeat every custom. The little word "such" before "universal" in the Code qualifies the former, and excludes from the section the meaning given by the judge. In this case, on this point, the evidence appears conflicting, and would hardly have established the custom contended for by defendant, even had the charge been right. Still, as the case will be tried again, and more light may shine upon the point, the defendant is entitled to the law of his case on this as on all the points he makes.

4. So too the court erred, we think, in charging on the subject of partnership. Champion was not sued as a partner, but individually, and there could not be a legal recovery against him as a partner. It matters not that the others who were alleged to be his partners were bankrupt; and that the recovery would come out of him in any event. The plaintiffs must sue him as he contracted with them, and recover accordingly. 43 *Ga.*, 587.

5. The evidence on some of these points is conflicting— sufficiently so to entitle the parties to have the law fully and accurately given to the jury; and as, in our view, that has not been done on every controverted point in the very protracted and complicated case the record makes, the ends of justice require a new trial.

We express no opinion whatever upon the weight of the evidence other than to say that it does not absolutely require the verdict without regard to the law given in charge;

and that law as given might have controlled the jury upon material points hotly contested. The judgment refusing the new trial is therefore reversed.

Judgment reversed.