CITIZENS' NAT. BANK OF CHICKASHA v. MITCHELL *et al.*

No. 2226, Okla., T.   Opinion Filed July 13, 1909.

(103 Pac. 720.)

1. **PARTNERSHIP—Creation—Contract.** A partnership is a relation arising out of a contract to do certain things, and exists only where the parties intend to enter into such a contract, and, unless they have estopped themselves by holding themselves out to the world as partners, their intentions, as derived from the contract, are decisive.

   (a)   M. and C. entering into a contract, by which each is to have a one-half interest, one to perform certain duties relative thereto, and the other certain other duties, there being a joint ownership and a joint contribution of labor, and the joint bearing of the burdens and expenses, whatever they may be, as well as sharing jointly in the profits, constitutes a "partnership."

2. **CONTRACTS—Public Policy——Prevention of Competition for Public Work.** A secret agreement between M. and C., the proposed bidders for a public contract, by which they bid on separate portions of the proposed work, pursuant to a mutual agreement, M. bidding on the largest portion of such work, with the understanding that if his bid is accepted M. and C. are to share as partners in such contract, is illegal in its nature and tendency; it not being necessary to show the particular effect of the contract, as such contract is condemned by public policy.

3. **CONTRACTS—Partial Illegality—Effect.** In any action brought in which it is necessary to prove an illegal contract in order to maintain the action, courts will not enforce it, nor will they enforce alleged rights directly springing from such contract.

   (a)   An accounting of the profits of a partnership will not be awarded, although the partnership was only part of a contract, of which the other portions were illegal.

4. **CONTRACTS—Money Advanced to Carry Out Illegal Contract —Right to Recover.** The plaintiff in error bank, in a separate

and independent collateral contract, the consideration of which is for money loaned or advanced to carry out a contract which was void as against public policy, on account of the secret agreement as to bidding, the purpose of the contract otherwise being lawful, said bank neither having been a party to nor having aided in the execution of such illegal bidding in any way, will not be precluded from recovering such loaned or advanced money.

5.    ASSIGNMENTS—Priority—Notice to Debtor. The banks, defendants in error, having procured subsequent assignments of the judgment and caused notice of such assignments to be given to the debtors therein, are valid holders of such assigned judgment as against the original assignee, the plaintiff in error bank, who had in no way given notice of its assignment.

(Syllabus by the Court.)

*Error from District. Court, Comanche County.*

Action by the Citizens' National Bank of Chickasha against E. F. Mitchell and others. Judgment for defendants, and plaintiff brought error to the Supreme Court of the Territory of Oklahoma, whence the cause was transferred to the Supreme Court of the State of Oklahoma. Judgment modified.

On the 11th day of February, 1905, the plaintiff in error, the Citizens' National Bank of Chickasha, as plaintiff, begain its action in the district court of Comanche county, territory of Oklahoma, against the defendants in error, E. F. Mitchell, City National Bank of Lawton, and the Merchants' & Planters' Bank of Lawton, as defendants. Thereafter the defendants appeared and answered, and issue was joined. On the 13th day of September, 1905, Arthur Coleman appeared and asked leave of the court to intervene and claimed a part of the subject-matter of said action, to wit, the proceeds of the judgment obtained by E. F. Mitchell against Wade and others in the sum of $2,602.23, which was granted, and said intervener duly filed such plea in intervention. On the 29th day of September, 1905, plaintiff filed its answer and cross-bill to said petition in intervention, and issue was duly joined thereon.

The findings of fact by the referee are as follows:

"Prior to July 2, 1901, the Kiowa and Comanche Indian reservation was divided into several pastures, each inclosed with a wire fence, and on that day the United States Indian agent at Anadarko opened bids for taking down those pasture fences and delivering the wire at certain points designated, and on that day E. F. Mitchell, one of the defendants, and Arthur Coleman, the intervener, were present for the purpose of submitting bids; but before submitting bids Coleman and Mitchell entered into a written agreement to the effect that, if the contract should be awarded to Mitchell, then Coleman was to superintend taking down the fences and Mitchell to look after all other matters, and to divide profits equally between them when the contract was completed. The written contract was in words and figures as follows: 'Anadarko, O. T., 7/2, 1901. Article of agreement made and entered into this day by and between E. F. Mitchell of El Reno, O. T., and Arthur Coleman, of Anadarko, O. T., witnesseth: It is hereby agreed by both parties herein mentioned that, should the contract let by Col. Randlett this day for taking down wire fences be awarded to E. F. Mitchell, the said Arthur Coleman is to have one-half interest in all of said contract and profits of the same to be equally divided at the end of the contract for whatever amount is made on said contract. Coleman to superintend the field work and Mitchell the balance. E. F. Mitchell. Arthur Coleman. Witness: Ralph Williams.'

"After the contract was entered into, and pursuant to an understanding between them, each, separately, submitted bids; Coleman bidding on certain fences farthest away and most difficult to get. As a result Mitchell's bid was considered the best bid, and on the 3d day of July, 1901, he was awarded the contract with the Indian agent to take down, roll into spools all the wire around the pastures, designating them by number, and deliver the same at certain points therein designated for the sum of $8.50 per 1,000 pounds; work to begin on the 8th day of July, 1901, and completed on or before July 31, 1901. The written contract between Mitchell and Coleman, and the bid of $8.50 per 1,000 pounds submitted by Mitchell, were made with the mutual understanding between them, not expressed in writing, that Mitchell should furnish the expense money, and that they would make their principal profit out of deals they hoped thereafter to make with various cattlemen then occupying the several pastures with herds of cattle; all business to be carried on in

Mitchell's name. On the day the contract was awarded him, or within a day or two thereafter, at Chickasha, Ind. T., Mitchell made arrangements with the plaintiff, the Citizens' National Bank of Chickasha, through its officers, B. P. Smith, president, and Ed Johns, cashier, by which the bank agreed to furnish Mitchell the necessary amount of money to pay the expenses of carrying out his contract within the Indian agent, but not to exceed $2,500. In the language of the parties, 'extended to Mitchell a line of credit' not to exceed $2,500; Mitchell agreeing on his part that all moneys collected should pass through the plaintiff bank.

"At the time this arrangement was made between Mitchell and the plaintiff bank, Coleman was also in Chickasha, and both Smith, as president, and Johns, as cashier, of the bank, knew, both from Mitchell and Coleman, of the arrangements between Coleman and Mitchell; and it was mutually understood between the parties, Mitchell, Coleman, and the bank, that the business was all to be carried on in Mitchell's name, that the bank was to extend to him a line of credit for the purpose of defraying expenses, not to exceed $2,500, and that all the proceeds from the contract should pass through the bank and be applied to the payment of the indebtedness thus created. Soon after these arrangements were made with the bank, Mitchell made and entered into written agreements with the several cattlemen holding cattle in the various pastures, by the terms of which he agreed, for certain considerations therein expressed, to leave the fences standing for certain periods of time, and among these contracts was the one with W. A. Wade and others, entered into at Marlow, Ind. T., on July 10, 1901, which is the basis of this action, and which is as follows: 'Marlow, I. T., 7-10 1901. I hereby agree with Wade, Silverstein, Weaver, Jennings and Stine that I will leave their pasture fences stand until August 3d for the sum of $750.00 and at the same ratio per day for what time I may get extension, this to be optional with either of them whether they wish the extension or any part of it, this amount to be due and payable at the bank of Marlow, I. T., at the expiration of this contract, as stated above. I agree to give each of them four days' notice prior to commencing work, provided extension is granted. Pastures as follows Nos. 11-14-16-17-18-19-20. This to be considered on a basis of 30 days' for the $750.00. E. F. Mitchell, J. H. Stine. Accepted: W. A. Wade. A. Silverstein. P. M. Means. W. H. Jennings.' Indorsed: 'I hereby transfer to Citizens' National Bank for collec-

tion. E. F. Mitchell.' 'No attention to notice letters returned. $150.00 paid by J. H. Stine.'

"At the first opportunity after getting these contracts executed, Mitchell deposited them with the plaintiff bank, including the one with Wade and others, which was left with the bank some time between the 10th and the 20th of July. They were all indorsed alike: 'I hereby transfer to Citizens' National Bank for collection. [Signed] E. F. Mitchell.' On the 17th day of June, 1901, being a few days prior to the arrangements between Mitchell and the bank above referred to, the bank had opened an account with Mitchell, based upon a letter of credit from a St. Joe banking house, and this account, at the time the 'line of credit' was extended to Mitchell to cover expenses of taking down the pasture fences, was overdrawn something over $300. Immediately after the contract with the Indian agent and the arrangements with the bank to furnish the money, Mitchell and Coleman, acting together, employed men and teams and began the work of taking down the fences, which was suspended for a time to comply with Mitchell's contract with the cattlemen. No work was done between the 9th of August and the 13th of October. The men employed by Mitchell and Coleman were paid by Mitchell giving his check on the Citizens' National Bank of Chickasha. Where Coleman settled with the men he gave an order on Mitchell, and when the order was presented to him he (Mitchell) took it up and gave his individaul check on the bank for the amount. These checks were all paid by the plaintiff bank, charged to Mitchell's personal account, which had been opened on the 17th day of June. All the expenses for taking down the fences were paid in this way. All the money coming from Mitchell and Coleman from all sources except on the contract of W. A. Wade and others, here in controversy, came into the bank and was placed to Mitchell's credit, with the exception of $150, which was collected by Mitchell. The amounts so collected and applied are:

From the government on original contract .................$2,116.14
From J. H. Connell ................................................. 421,35
    "    Driggers & Sharp ....................................... 239.50
    "    J. H. Connell ............................................. 481.92
    "    J. H. Connell ............................................. 426.35
    "    Lee Crenshaw ............................................ 429.15
    "    Hide & Witherspoon ..................................... 515.00
    "    Blackburn ................................................ 75.00

    Total ........................................................$4,704.41

"During the same time Mitchell carried on other business, and made deposits of the moneys and drew check against the account on his individual account, and it was all carried by the bank in the one account. The amount so checked out between June 17, 1901, and January 31, 1902, was $8,251.31; but what part of that amount was used for the benefit of Mitchell and Coleman, and what part for Mitchell, is not shown. Mitchell's indebtedness to the bank was renewed from time to time until September 13, 1902, at which time he executed his note to the bank for $1,368 to settle the account. What part, if any, of the $1,380 indebtedness from Mitchell to the bank was for the benefit of Mitchell and Coleman does not appear. About December 10, 1901, Mitchell and Coleman had a settlement of all their affairs, except as to this contract with Wade and others which is here in controversy. In February, 1902, the bank and Mitchell entered into an agreement to bring suit on the contract with Wade and others, the judgment to go first, to settling the indebtedness to the bank, and all over the amount necessary to go to Mitchell. To this end each employed counsel, the bank, employing Mr. Welbourne of Chickasha, and Mitchell employing Mr. McClure of Marlow, who, acting together, instituted suit in the court at Chickasha, Ind. T. Afterwards, upon the representations of Mitchell that conditions were more favorable to the plaintiffs in Oklahoma than in the Indian Territory, the bank and its attorneys and Mitchell and his attorney agreed that the suit at Chickasha should be dismissed and the whole matter placed in Mitchell's hands to bring suit in the district court of this county, with the same understanding as to the application of the judgment when secured. Pursuant to that agreement, the suit at Chickasha was dismissed, and the contract turned over to Mitchell, either by the bank or its attorneys. Mitchell brought the contract to Lawton, employed counsel, and instituted suit in the district court against Wade and others (being No. 174 on the docket of said court), and in January, 1903, recovered judgment against the defendants, from which the defendants appealed to the Supreme Court. The appeal was dismissed by the Supreme Court, and the mandate of the Supreme Court was returned and filed in the district court of Comanche county, thereby making judgment final. After the judgment became final, the defendants paid the judgment in to the clerk of the district court of said county, being $2,712.75, which said sum is now being held by the clerk of said

court to abide the result of this action. The expenses of the litigation in recovering the judgment were paid by Mitchell, approximately $800.

"On the 3d day of August, 1903, being indebted to the City National Bank of Lawton, one of the defendants, in the sum of $1,567.19, Mitchell executed two notes, one for $700 and one for $867.19, and to secure the payment assigned said judgment in cause No. 174 to the City National Bank by a written assignment, in the following language: 'Assignment of Judgment. Know all men by these presents that whereas I, Edward F. Mitchell, of Comanche county, Oklahoma, did obtain a judgment in the district court of Comanche county, Oklahoma, wherein Edward F. Mitchell is plaintiff against Wade, Stein, and Silverstein *et al.*, defendants, said judgment and case is now in the Supreme Court of the territory of Oklahoma, and the amount of the same is $2,275: Now therefore, I, Edward F. Mitchell, for a valuable consideration, do hereby sell, assign and transfer unto the City National Bank of Lawton, Oklahoma, all my right, title and interest in and to said judgment, or any judgment that may be hereafter obtained in any of the courts of Oklahoma Territory in this case for the use and benefit of its legal representatives. In testimony whereof, I have hereunto set my name and affixed my seal at Lawton, Oklahoma Territory, this third day of August, 1903. This is given to secure every and all indebtedness due the City National Bank, Lawton, Oklahoma. [Signed] E. F. Mitchell. Witnesses: Guy C. Robertson. W. J. Donald.' Indorsements as follows: 'No. 174. B-5455. Assignment of Judgment. E. F. Mitchell to City Nat. Bank, Lawton, Territory of Oklahoma, County of Comanche: ss.—This instrument was filed for record on the 5th day of August, A. D. 1903, at 12:30 o'clock p. m. and duly recorded in Book 1 of R. and A. of page 176. [Signed] J. Robt. Gillam, Register of Deeds. Filed June 21, 1904. N. E. Sisson, Clerk, by L. S. Eckles, Dep.' This assignment was filed of record in the office of the register of deeds August 5, 1903. April 28, 1904, Mitchell, being indebted to the Merchants' & Planters' Bank of Lawton, one of the defendants, assigned all of said judgment to the Merchants' & Planters' Bank of Lawton, except the amount already assigned to the City National Bank. Said assignment was in writing and in words as follows: 'Merchants' & Planters' Bank. Capital Paid in $25,-000.00. Foster V. Brown, Prest. T. J. Gibson, Vice Prest. D.

R. Rankin, Cashier. Joe E. Brown, Asst. Cashier. Lawton, Okla., April 28, 1904. To Whom it may Concern: For value received I hereby sell, assign and convey unto the Merchants' & Planters' Bank of the City of Lawton, Oklahoma, all my right, title and interest in a judgment now pending in the Supreme Court of the territory of Oklahoma in my favor against Silverstein and others for about $2,400.00, except the amount already assigned by me to City National Bank (twelve hundred). [Signed] E. F. Mitchell. Territory of Oklahoma, County of Comanche—ss.: On this the 28th day of April, 1904, before me personally appeared E. F. Mitchell, known to me to be the person who executed the foregoing assignment and acknowledged that he executed the same. [Signed] Logan Fain, Notary. My commission expires July 31, 1905.' This was filed for record in the district clerk's office June 13, 1904.

"It is agreed between the parties, if judgment in this case shall be for defendants, the City National Bank and the Merchants' & Planters' Bank each shall be entitled to amounts as follows: The City National Bank, $1,817.50, and the Merchants' & Planters' Bank, $895.25. At the time of these assignments, neither the City National Bank nor the Merchants' & Planters' Bank had any notice of any lien or claim against the judgment by either Coleman or the Citizens' National Bank. Coleman knew that the contract with Wade and others here in controversy (as well as all the other contracts) was in the possession of the Citizens' National Bank, to be by it collected and the proceeds applied to the payment of the money advanced by the bank for the benefit of Mitchell and Coleman, but did not know that the account in the bank was mingled with Mitchell's general bank account. Coleman did not know anything about the arrangements between Mitchell and the bank whereby the judgment when secured against Wade and others was to become the property of the bank, nor did he know that the money collected on the contract with Wade and others, or any other contract with Mitchell for the benefit of Mitchell and Coleman, was to be applied to the payment of any other indebtedness than that necessarily created for the payment of expenses in taking down the fences or incidental thereto. Coleman is indebted to the plaintiff on a promissory note in the sum of $339.76 ,and interest at the rate of 8 per cent. from the 1st day of January, 1902. The defendant Mitchell is indebted to the plaintiff on a promissory note in the

sum of $1,368, and interest at the rate of 8 per cent. from the 1st day of November, 1902.

"Respectfully submitted,

"[Signed] R. J. RAY, Referee.

, "In response to the request of the defendant the Merchants' & Planters' Bank, filed September 5th, 1906, and attached thereto, the following finding is made: At the time of the assignment by Mitchell to the Merchants' & Planters' Bank of the judgment in the case of Mitchell v. Wade and Others, Mitchell owed the Merchants' & Planters' Bank more than the amount it was to receive out of the judgment.       [Signed] R. J. RAY, Referee.

"In response to the request of the plaintiff, the Citizens' National Bank of Chickasha, filed September 1, 1906, and attached hereto, I make the following additional findings; the same being paragraphed and numbered to correspond to the separate requests for additional findings:

· "(1) At the time defendant Mitchell made arrangements with the plaintiff to advance him money to carry out his contract in taking down the fences, it was agreed by and between Mitchell and the bank, acting through its president and cashier, that the original contract with the government and any contracts to be executed by Mitchell and the cattlemen to permit them to remain in the pastures were to be deposited by Mitchell with the bank, and moneys due on all such contracts to be collected by the bank, and to be applied so far as necessary to repay the advancements made by the bank to Mitchell to cover expenses of carrying out his contract with the government; but as to whether or not they were to be deposited 'as collateral security' is a question of law, and not a question of fact, and therefore not answered. At the time Mitchell deposited the contract with Wade and others with the bank, it was so deposited pursuant to his original agreement with the bank as above set forth.

· "(2) In February, 1902, at the time the Citizens' National Bank of Chickasha and Mitchell entered into an agreement to bring suit on the contract against Wade and others, at Chickasha, the bank was holding said contract under the agreement set forth in paragraph 1, and continued to hold it under the same agreement, and did so hold at the time it was agreed that the suit should be dismissed at Chickasha and brought at Lawton, Okla., and afterwards in September, 1902, Mitchell executed a renewal note for all his indebtedness to the bank, the note being the one

described in plaintiff's petition in this action; but it does not appear from the testimony what part, if any, of the indebtedness so renewed, was created in carrying out Mitchell's contract with the government.

"(3) The assignments of the judgment against Wade and others by Mitchell to the City National Bank and to the Merchants' & Planters' Bank were for money theretofore loaned to Mitchell, and not for money paid or loaned at the time of the assignments.

"(4) The indebtedness of Mitchell to the City National Bank and also to the Merchants' & Planters' Bank at the time the assignments of the judgments were made was the individual indebtedness of Mitchell, and Coleman was in no way responsible therefor.

"(5) The Citizens' National Bank of Chickasha had no knowledge of the transfers from Mitchell to the City National Bank and Merchants' & Planters' Bank until right after the case was dismissed in the Supreme Court and just before the money was paid into the court, and not long before this suit was brought.

"(6) During the time that Mitchell was drawing checks on the Citizens' National Bank of Chickasha to pay the expenses of carrying out his contract with the government, and for other purposes, the bank had no way of telling when a check was presented for payment whether the check was given to pay expenses of carrying out the contract with the government, or for some other purpose. There were no marks or notations made on checks given by Mitchell to show for what purpose they were given.

"(7) This does not call for a finding of fact on any particular question.

"(8) At the time it was agreed between Mitchell and his counsel and the Citizens' National Bank and its counsel that the suit pending in the United States court at Chickasha should be dismissed and suit brought at Lawton, the only agreement was that it should be brought at Lawton under the same agreement they had made at the time the suit was brought at Chickasha. The only change was that Mr. McClure should no longer appear as counsel for Mitchell. There was no additional consideration for turning the contract over to Mitchell to bring suit upon in Oklahoma.

"(9) The Citizens' National Bank of Chickasha had no security for the money advanced to Mitchell to be used by Mitchell and Coleman to pay the expenses of carrying out Mitchell's contract with the government, other than the contracts deposited with the bank (including the one with Wade and others), and the depositing of these contracts with the bank, together with the agreement that all moneys from these contracts should be applied by the bank on that indebtedness to the amount necessary to satisfy the indebtedness, was the inducement which caused the bank to make the advancement to that purpose; but a part of the advancement to Mitchell was induced by a letter of credit from a St. Joe banking house.

"[Signed] R. J. RAY, Referee."

On the 11th day of September, 1906, there was filed in said cause an assignment and transfer of claim and judgment from Arthur Coleman, intervener, to the plaintiff therein, which is in words and figures as follows:

"That, I, Arthur Coleman, of Caddo county, Oklahoma Territory, for and in consideration of eight hundred and fifty ($850.00) dollars, to me in hand paid by the Citizens' National Bank of Chickasha, the receipt of which is hereby acknowledged, do hereby sell convey, transfer, set over and deliver to the said Citizens' National Bank of Chickasha, all my right, title and interest in and to the claim sued upon by me as intervener in the above-entitled action, and to any and all judgments which may be obtained in the above-entitled action, the claim hereby conveyed being a claim to one-half interest in certain moneys now in the hands of the clerk of the district court of Comanche county, Oklahoma Territory, being money collected by him on judgment, obtained in cause No. 174 on the docket of said court wherein E. F. Mitchell was plaintiff and W. A. Wade, J. H. Stine, A. Silverstein, F. M. Weaver and W. H. Jennings were defendants; and I hereby, for the consideration aforesaid, transfer, convey and set over to said Citizens' National Bank of Chickasha, all my right, title and interest in and to said moneys or said judgment rendered in said cause No. 174 aforesaid; and I hereby authorize and direct said Citizens' National Bank of Chickasha to prosecute the above-entitled action and my claim therein, either in my name or in its name, or in the name of both, as they may deem proper, and to do any and all acts which I

would be authorized to do if I still owned said claim; and I further authorize said Citizens' National Bank of Chickasha, its agents, attorneys or assigns, to collect any and all moneys which may be due, owing or coming to me on said claim, or on said judgment rendered in cause. No. 174, or which may be adjudged to me in the above-entitled action, and to sign my name to any and all papers, receipts or other instruments, which it may see proper so to do, in connection with said matter and to do any and all other acts which I or my attorneys could do in case I had not made this transfer."

On the 29th day of March, 1907, the plaintiff bank filed in said cause its motion to confirm the report of the referee therein, and for judgment in its favor upon said report; the body of said motion being in words and figures as follows:

"And now comes the plaintiff above named, and here moves the court to enter judgment upon the findings of the referee returned herein, for the plaintiff, as follows, to wit: (1) A personal judgment against E. F. Mitchell for the amount prayed for in its amended petition upon the note therein set out, together with interest thereon and costs. (2) That the plaintiff be decreed to be the owner of and entitled to the fund in the hands of the clerk of the district court, received upon the judgment in the case of E. F. Mitchell v. Silverstein, Wade, and others, and that the said defendants, the City National Bank and Merchants' & Planters' Bank, be restrained and enjoined from attempting to take or receive said fund or any part thereof, and for such other and proper and appropriate relief as the findings of the referee may make just and proper."

On the same day the defendants filed in said cause their motion to confirm the report of the referee therein and for judgment in their favor upon said report, the body of which motion is in words and figures as follows:

"Come now said defendants and each of them, and move the court to confirm the report of the referee heretofore filed herein, and to render judgment thereon in favor of said defendants and against the plaintiff, as follows: That the plaintiff take nothing by its action herein, and that the defendants and each of them have judgment for costs herein, and that the temporary injunction heretofore granted herein be dissolved."

On said date said cause was heard upon the motion of the plaintiff to confirm the report of the referee and for judgment on said report, which said motion was upon consideration by the court, in so far as it requested that the plaintiff have judgment thereon, overruled, to which ruling of the court the plaintiff then and there excepted and objected. Afterwards, on the same date, said cause was heard upon the motion of the defendants to con-firm the report of the referee and for judgment thereon, which said motion was, upon consideration by the court, sustained, to which ruling of the court plaintiff then and there excepted and objected. Afterwards, on the same date, plaintiff filed its motion for a new trial, which was overruled, and exceptions saved. An appeal was prosecuted by the plaintiff on petition in error to the Supreme Court of the territory of Oklahoma, and, by virtue of the provisions of the Enabling Act and the Schedule to the Con-stitution, it is now properly before this court for consideration.

*Welbourne & Hayes, Stevens & Meyers,* and *C. M. Oaks,* for plaintiff in error, citing, among others, the following authorities: On question of legality of contracts: *Hunt v. Elliott,* 80 Ind. 245; *Bellows v. Russell,* 20 N. H. 427; *Whalen v. Brennan* (Neb.) 51 N. W. 759; *Irvin v. Irvin,* 169 Pa. 529; *Finley v. Quirk,* 9 Minn. 194; *McDearmott v. Sedgwick* (Mo.) 39 S. W. 776; *Horton v. Rohiff* (Neb.) 95 N. W. 36; *Rucker v. Bolles* (C. C. A.) 133 Fed. 858; *Angela v. McMaster* (Okla.) 87 Pac. 660; 9 Cyc. 557, 558, and cases cited; *Tenant v. Elliott,* 1 B. & P. 3, 4 Rev. Rep. 755; *Baldwin v. Potter,* 46 Vt. 402, 408; *Willson v. Owen,* 30 Mich. 474. On priorities as between plaintiff and de-fendant banks: *Schofield v. Moore,* 31 Iowa, 241, 245; Wilson's St. 1903, § 2803; *Bank v. Bates,* 120 U. S. 556.

*Smith & Thomas* and *Hamon & Mitschrich,* for defendant in error. On priorities among assignments: *Jack v. National Bank of Wichita,* 17 Okla. 430.

WILLIAMS, J. (after stating the facts as above). The follow-ing questions are raised in this record:

(1) Did the contract entered into by and between E. F. Mitchell and Arthur Coleman, on July 2, 1901, constitute a partnership between them?

(2) Was said contract against public policy, and therefore void?

(3) Although said contract may have been void as against public policy, the same having been carried out and executed with the exception of a final accounting between the parties, will one party thereto, under the facts of the case, be compelled to contribute to the other his share of the profits?

(4) Was the plaintiff in error bank so related to the illegal contract as to preclude its recovery for money advanced in carrying out said contract, and complying with its terms with the government, through the Indian agent?

(5) Were the banks, defendants in error, in taking the subsequent assignments to secure pre-existing debts, having caused notice of such assignments to be given the debtors in such judgment, valid holders of such assignments as against the original assignee, the plaintiff in error bank?

1. A partnership exists as a result of a voluntary contract between the parties, and never solely by operation of law. *Causler v. Wharton,* 62 Ala. 358; *Cowles v. Garrett,* 30 Ala. 341; *Haycock v. Williams,* 54 Ark. 384, 16 S. W. 3; *Einstein v. Gourdon,* 4 Woods, 415, 8 Fed. Cas. No. 4,320; 22 Am. & Eng. Ency. of Law (2d Ed.) p. 14, footnote 3. It is a relation arising out of a contract to do certain things, and exists only where the parties intend to enter into a contract of partnership, and, unless they have estopped themselves by holding themselves out to the world as partners, their intention as derived from the contract is decisive of the question. In this contract Mitchell and Coleman each had an undivided one-half interest, and the profits therefrom were to be equally shared; Coleman to superintend the field work, and Mitchell the balance of the work. Here is a joint ownership of the contract, and each party contributes his labor thereto. If Coleman was not intended to be a partner, why stipulate that

Mitchell should contribute his labor to a certain part of the work? And if Coleman had a one-half interest in the contract, he contributing his labor and Mitchell his also, the contract providing that Coleman should superintend the field work, which presupposes that other employees would be hired, who would bear the burdens of this expense but the joint owners of the contract? Hence we find this contract clearly within the rule—joint owners, bearing the joint expenses advanced by one of the partners, sharing the profits, and, of course, if there were no profits, the consequences of liability would be that they would share the joint losses. That constituted a partnership. *Jones v. Davies,* 60 Kan. 314, 56 Pac. 484, 72 Am. St. Rep. 354; *McCreary v. Slaughter,* 58 Ala. 233.

2. In the case of *McMullen v. Hoffman,* 174 U. S. 644, 670, 19 Sup. Ct. 481, 43 L. Ed. 1117, the court said:

"Looking in the record before us, we find that the pleadings, and proofs taken therein show that for some time prior to the 6th of March, 1893, the city of Portland intended to add to its water supply by bringing to the city the water from a creek or river called 'Bull Run,' some 30 miles distant, and for that purpose it had issued through its water committee proposals for bids to build the works, which proposals were divided into several different classes as already stated. The complainant, McMullen, living in San Francisco, and being a large stockholder and manager of the San Francisco Bridge Company, came to Portland for the purpose of giving his attention to the matter, and, if possible, to make arrangements with the defendant by which they might together become bidders for the work. He and the defendant had many interviews before the time for delivering the bids arrived, and they finally agreed that each party should put in separate bids, in his own or his firm name, or in the name of his company, for certain classes of the work, but that they both should have a common interest in each bid if any were accepted. This community of interest was to be kept secret and concealed from all persons, including the water committee. Each was to know the amount of the other's bid, and all bids were to be put in only after mutual consultation and agreement. Bids for the various classes of work were put in as above set forth, and among them the

bid for the manufacture and laying of the pipe, which was accepted by the water committee. All of them were put in pursuant to this agreement, part of them in the name of Hoffman & Bates, and part in the name of the San Francisco Bridge Company. The bid in the name of the San Francisco Bridge Company for the manufacture of the pipe was nearly $50,000 higher than the amount bid in the name of Hoffman & Bates, and was put in after consultation with and approval by the defendant. This last bid was put in, as stated by Mr. McMullen in his evidence, as a matter of form only, and to keep the name of his company before the public; but it appeared on its face to be a *bona fide* bid. The water committee received the bids in ignorance of the existence of this agreement and in the supposition that all the bids which were received were made in good faith, and they all received consideration at the hands of the committee. After the computations were made by which it appeared that the bid of the defendant was the lowest for the manufacture and laying of the pipe, the contract was awarded him, and afterwards that portion of the agreement which had been made between the parties to this combination, viz., that relating to the partnership, was reduced to writing, and is set out in the foregoing statement.

"Upon these facts the question arising is whether a contract between the parties themselves, such as is above set forth, is illegal? In order to answer the question, we would first naturally ask: What is its direct and necessary tendency? Most clearly that it intends to induce the belief that there is really competition between the parties making the different bids, although the truth is that there is no such competition and that they are in fact united in interest. It would also tend to the belief on the part of the committee receiving the bids that a *bona fide* bidder, seeking to obtain the contract, regarded the price he named, although much higher than the lowest bid, as a fair one for the purpose of enabling him to realize reasonable profits from its performance. A bid thus made amounts to a representation that the sum bid is not in truth an unreasonable or too great a sum for the work to be done. We do not mean that it is a warranty to that effect, or anything of the kind, but simply that a committee receiving such a bid and assuming it to be a *bona fide* bid would naturally regard it as a representation that the work to be done, with a fair profit, would, in the opinion of the bidder, cost the amount bid. Hence it would

almost certainly tend to the belief that the lower bid was not an unreasonably high one, and that it would be unnecessary and improper to reject all the bids and advertise for a new letting. The fact that there were other bids even higher than that of the San Francisco Bridge Company for the manufacture and laying of the pipes does not alter the tendency of the agreement when carried into effect, to create or strengthen the belief on the part of the committee in the fact of an active competition and the *bona fide* character of that competition, and that the lowest bid would be in all probability a reasonable one. It is, in truth, utterly impossible to accurately or fully predict all the vicious results to be apprehended as the natural effect of this kind of an agreement. It cannot be said in all cases just what the actual effect may have been. The natural tendency and inherent character of the agreement are also unaffected by any evidence produced on the part of the complainant that the chairman of the water committee has, when examined nearly three years after the occurrence, no recollection as to the bid of the bridge company, or that it had any particular effect upon his mind, and that he said that the contract was awarded to the lowest bidder simply because he was the lowest bidder, and without reference to the bid of the bridge company. The question is not whether, in this particular case, any member of the water committee did or did not remember the fact that the bridge company had made a bid, or that such bid had no effect upon his mind. The question is not as to the effect a particular act in fact had upon a member of the water committee, but what is the tendency and character of the agreement made between the parties; and that tendency or character is not altered by proof on the part of a member of the committee. given several years afterwards, that he had no special recollection that such a bid had been made. The evidence is that all the bids that were given received the consideration of the committee, and there can be no doubt that the more bids there were, seemingly of a *bona fide* character, the more the committee would be impressed with the idea that there was active competition for the work to be done. It might readily be surmised that, if these parties had bid in competition, one or both of the bids would have been lower than their combined bid. It is not necessary, however, to prove so difficult a fact. The inference would be natural. * * * Contracts of the nature of this one are illegal in their nature and tendency, and for that reason no inquiry

is necessary as to the particular effect of any one contract, because it would not alter the general nature of contracts of this description or the force of the public policy which condemns them.

"In the case at bar the illegal character of the agreement is founded, not alone upon the fact that it tends to lessen competition, but also upon the fact of the commission of a fraud·by the parties in combining their interests and concealing the same, and in submitting different bids as if they were *bona fide,* when they knew that one of them was so much higher than the other that it could not be honestly accepted, and when they put it in for the sake of keeping up the form and of strengthening the idea of a competition which did not in fact exist. The tendency of such agreements is bad, although in some particular case it might be difficult to show that it actually accomplished a fraud, while its intention to do so would be plain enough. Therefore, when it is urged that these parties had no intention of bidding for this work alone, and unless they had combined their bids neither would have bid at all, and hence the agreement between them tended to strengthen instead of to suppress competition, this answer to the illegality of the transaction is sufficient. The evidence, however, does not show that, if these parties had not agreed upon a combination, neither would have bid alone. It shows complainant came to Portland to see the defendant and to conclude their arrangements to go into the combination; but we are by no means of the opinion that the evidence shows that if they had not combined they would not have bid at all. Complainant's company had bid alone at a prior letting, some time before, and had then been the lowest bidder for the contract, which the city did not award for a lack of means of payment for the work consequent upon a veto by the Governor of the bill providing for the issuing of bonds to make such payment, and it seems that the defendant himself was well able to carry on the contract alone.

"If it be granted that the fact was proved that neither party would have bid separately, and that by virtue of the combination a bid was made which otherwise would not have been offered, the significance of the other facts in the case is not thereby altered. Those facts are the concealment of the interest which the parties had in each other's bids, and the making of what were under the circumstances nothing more than fictitious bids for this and the other classes of work for which both parties put in bids, evidently for no other purpose than to endeavor thereby to deceive the com-

mittee into believing that there was real competition between them, when in fact there was none. If there had been competition, the bid of each for the contract that was obtained might very likely have been lower than the one that was accepted. It is not necessary to prove that fact in order to show the nefarious character of the agreement. The reason given for the making of these fictitious bids by the complainant, that it was a formal matter, and to keep the name of his company before the public, is entirely inadequate. The bids actually put in by them for the other classes of work had the same tendency to strengthen belief in the reality of the competition which in fact did not exist between these persons. The whole transaction was intentionally presented to the water committee in a false and deceptive light. Upon general principles it must be apparent that biddings for contracts for public works cannot be surrounded with too many precautions for the purpose of obtaining perfectly fair and *bona fide* bids. Such precautions are absolutely necessary in order to prevent the successful perpetration of fraud in the way of combinations among those who are ostensible rivals, but who are secretly banded together for the purpose of obtaining contracts from public bodies, such as municipal and other corporations, at a higher figure than they otherwise would. Just how the fraud is to be successfully worked out by the combination, it is not necessary to show. It is enough to see what the natural tendency is. Public policy requires that officers of such corporations, acting in the interest of others, and not using the sharp eye of a practical man engaged in the conduct of his own business, and not controlled by the powerful motives of self-interest, should, so far as possible, and for the sake of the public whom they represent, be protected from the dangers arising out of a concealed combination and fictitious bids.

"To hold contracts like the one involved in this case illegal is not to create any new rule of law for the purpose of affording the protection spoken of. It is but enforcing an old rule, and applying it to such facts as exist in this case because it naturally fits them. Its enforcement here is but to carry into effect the public policy upon which the rule itself is founded. People who have been guilty of the conduct exhibited in this record cannot be heard to say that, although their arrangement was fraudulent and illegal, they would nevertheless have obtained the contract even if they had not been guilty of the fraud, because the bids

show they were the lowest bidders. The bids might have been lower yet if there had been competition where there was in fact combination. The parties must accept the consequences resulting from entering into the agreement proved in this case, all of which they carried out, and included in which and as a consequence thereof was the agreement between the city and the written agreement of partnership between themselves. * * * In *Atcheson v. Mallon*, 43 N. Y. 147, 151, 3 Am. Rep. 678, Judge Folger, in delivering the opinion of the court, said: 'But a joint proposal, the result of honest co-operation, though it might prevent the rivalry of the parties, and thus lessen competition, is not an act forbidden by public policy. Joint adventures are allowed. They are public and avowed, and not secret. The risk, as well as the profit, is joint, and openly assumed. The public may obtain at least the benefit of the joint responsibility, and of the joint ability to do the service. The public agents know, then, all that there is in the transaction, and can more justly estimate the motives of the bidders, and weigh the merits of the bid.' We have here nothing to do with a combination of interest which is open and avowed, which appears upon the face of the bid, and which is therefore known to all. Such a combination is frequently proper, if not essential, and, where no concealment is practiced and the fact is known, there may be no ground whatever for judging it to be in any manner improper. * * *

"Concluding, as we do, that this agreement between these parties is as a whole of an illegal nature, and that the portion thereof which is reduced to writing cannot be separated from the balance of the agreement, the question then arises as to the result of such conclusion upon the parties to the agreement. There are several old and very familiar maxims of the common law which formulate the result of that law in regard to illegal contracts. They are cited in all law books upon the subject, and are known to all of us. They mean substantially the same thing, and are founded upon the same principles and reasoning. *Ex dolo malo non oritur actio. Ex pacto illictio non oritur actio. Ex turpi causa non oritur actio.* About the earliest illustration of this doctrine is almost traditional in the famous case of The Highwayman. It is stated that Lord Kenyon once said, by way of illustration, that he would not sit to take an account between two robbers on Hounslow Heath, and it was questioned whether the legend in regard to the highwayman did not arise from that saying. It seems, however, that the case was a real one. He did

file a bill in equity for an accounting against his partner, although it was no sooner filed and its real nature discovered than it was dismissed with costs, and the solicitors for the plaintiff were summarily dealt with by the court as for a contempt in bringing such a case before it. 1 Lindley, Partnership (5th Ed.) 94, note "n"; 9 Law Quarterly Review (London), pp. 105-197. The authorities from the earliest time to the present unanimously hold that no court will lend its assistance in any way towards carrying out the terms of an illegal contract. In case any action is brought in which it is necessary to prove the illegal contract in order to maintain the action, courts will not enforce it, nor will they enforce any alleged rights directly springing from such contract. In cases of this kind the maxim is: *Potior est conditio defendentis.*"

In the case at bar the defendant E. F. Mitchell and the intervener, Arthur Coleman, before submitting bids, entered into a written agreement, to the effect that, if the contract for the taking down of the wire fence be awarded to Mitchell by the Indian agent, the said Coleman should have a one-half interest in said contract, and the profits derived therefrom, etc. Now, this contract covered the bid that was to be put in in the individual name of E. F. Mitchell. This interest in the result of the bidding would necessarily be a secret interest so far as the Indian agent was concerned, the bid not on its face showing that there was any secret partnership; and the finding of the referee shows that at the time said secret agreement was made the said E. F. Mitchell and Arthur Coleman were there for the purpose of bidding on the contract for taking down the wire fences around the pastures on the Indian reservations. After said contract was entered into, Coleman did not bid against Mitchell; but, pursuant to an understanding between them, each separately submitted bids, Coleman bidding on certain fences farthest away and most difficult to get. Following the authority of *McMullen v. Hoffman, supra,* this contract between Mitchell and Coleman was void, on the ground of public policy.

3. In the case of *McMullen v. Hoffman, supra,* the court further said:

"If the partnership agreement that is contained in the writing above set forth is in truth but part of an entire agreement, which contains utterly illegal provisions, then this action cannot be maintained within any of the authorities.  It is only by proving the the partnership agreement as an entire agreement, separate and free from the balance of the agreement between the parties, that argument can be made in favor of its validity.  It has been sometimes said that where a contract, although it be illegal, has been fully executed between the parties so that nothing remains thereof for completion, if the plaintiff can recover from the defendant moneys received by him without resorting to the contract the courts will permit a recovery in such case.  The cases cited as illustrating the exception are, among others: *Tenant v. Elliott* (1797) 1 Bos. & P. 2; *Farmer v. Russell* (1798) 1 Bos. & P. 296; *Sharp v. Taylor* (1849) 2 Phill. Ch. 801, 817; *Armstrong v. Toler* (1826) 11 Wheat. 258, 269, 6 L. Ed. 468, 471; *McBlair v. Gibbes;* 17 How. 232, 235, 15 L. Ed. 132, 134; *Brooks v. Martin* (1863) 2 Wall. 70, 17 L. Ed. 732; *Planters' Bank v. Union Bank* (1872) 16 Wall. 483, 21 L. Ed. 473; *Armstrong v. American Exchange National Bank of Chicago* (1889) 133 U. S. 433, 466, 10 Sup. Ct. 450, 33 L. Ed. 749, 759.

"Upon the point as to the ability of the plaintiff to make out his cause of action without referring to the illegal contract, it may be stated that the plaintiff for such purpose cannot refer to one portion only of the contract upon which he proposes to found his right of action, but that the whole of the contract must come in, although the portion upon which he founds his cause of action may be legal.  *Booth v. Hodgson,* 6 T. R. 405, 408; *Thompson v. Thompson,* 7 Ves. Jr. 470; *Embrey v. Jemison,* 131 U. S. 336, 348, 9 Sup. Ct. 776, 33 L. Ed. 172, 177. In the first of the above cases, the plaintiff sought to maintain his action by referring to that part of the contract which was not illegal, and to ask a recovery upon that alone.  Lord Kenyon, Chief Justice, observed that it seemed to be admitted by counsel for the plaintiff 'that if the whole case was disclosed to the court there was no foundation for the demand.  They say to the court: "Suffer us to garble the case, to suppress such parts of the transaction as we please, and to impose that mutilated state of it on the court as the true and genuine transaction, and then we can disclose such a case as will enable our clients to recover in a court of law." Such is the substance of this day's argu-

ment. It is a maxim of our law that a plaintiff must show that he stands on a fair ground when he calls on a court of justice to administer relief to him.' Mr. Justice Ashurst, in the same case, said: 'The plaintiffs wish us to decide this case on a partial statement of the facts, thereby admitting that if the whole case be disclosed they have no prospect of success; but we must take the whole case together, and upon that the plaintiffs cannot recover.' Mr. Justice Grose said: 'We cannot decide on a part of the case; and, taking the whole together, an *assumpsit* cannot be raised from one part of the case when the other parts of it negative an *assumpsit.*' The defendant therefore had judgment.

"In *Thompson v. Thompson, supra,* the plaintiff was not permitted to recover, because he had no claim to the money except through the medium of an illegal agreement. The Master of the Rolls (Sir William Grant) said: 'If the case could have been brought to this, that the company had paid this into the hands of a third person for the use of the plaintiff, he might have recovered from that third person, who could not have set up this objection (the illegality of the contract) as a reason for not performing his trust. *Tenant v. Elliott* is, I think, an authority for that. But in this instance it is paid to the party, for there can be no difference as to the payment to his agent. Then how are you to get at it, except through this agreement? There is nothing collateral, in respect of which, the agreement being out of the question, a collateral demand arises, as in the case of stock jobbing differences. Here you cannot stir a step but through the illegal agreement, and it is impossible for the court to enforce it. I must therefore dismiss the bill.'

"In the case of *Embrey v. Jemison, supra,* although the action was upon four negotiable notes, the court would not permit a recovery to be held upon them, because the consideration for the notes was based upon a contract which was illegal. Mr. Justice Harlan, in delivering the opinion of the court, said that the plaintiff could not 'be permitted to withdraw attention from this feature of the transaction by the device of obtaining notes for the amount claimed under that illegal agreement, for they are not founded on any new or independent consideration, but are only written promises to pay that which the obligor had verbally agreed to pay. They do not, in any just sense, constitute

a distinct or collateral contract based upon a valid consideration. Nor do they represent anything of value in the hands of the defendant, which, in good conscience, belongs to the plaintiff or to his firm. Although the burden of proof is on the obligor to show the real consideration, the execution of the notes could not obliterate the substantive fact that they grew immediately out of, and are directly connected with, a wagering contract. They must therefore be regarded as tainted with the illegality of that contract, the benefits of which the plaintiff seeks to obtain by this suit. That the defendant executed the notes with full knowledge of all the facts is of no moment. The defense he makes is not allowed for his sake, but to maintain the policy of the law'—citing *Coppell v. Hall,* 7 Wall. 542, 558, 19 L. Ed. 244, 248.

"In the latter case Mr. Justice Swayne, delivering the opinion of the court, said: 'Whenever the illegality appears, whether the evidence comes from one side or the other, the disclosure is fatal to the case. No consent of the defendant can neutralize its effect. A stipulation in the most solemn form to waive the objection would be tainted with the vice of the original contract, and void for the same reasons. Wherever the contamination reaches it destroys. The principle to be extracted from all the cases is that the law will not lend its support to a claim founded upon its violation.'

"These authorities uphold the principle that the whole may be shown, and the plaintiff cannot prevent it by proving only so much as might sustain his cause of action, and then objecting that the defendant himself brings in the balance which was not necessary for plaintiff to prove.

"The cases above cited as illustrative of the exceptions to the general rule also show what is meant by the cause of action being founded on some new consideration, or upon a contract collateral to the original illegal one. In *Tenant v. Elliott, supra,* it was held that where two persons had entered into an illegal contract in regard to insurance, and, a loss having occurred, the insured paid the money to a third person to be paid to plaintiff, the third person could not himself retain the money, because it arose out of an illegal contract. Eyre, Chief Justice, asked, 'whether he who had received the money to another's use on an illegal contract can be allowed to retain it, and that not even at the desire of those who paid it to him.' In such case clearly the de-

fendant had nothing whatever to do with the illegality of the original contract. He received the money to be paid to another, and when he received it for that purpose he promised, either expressly or by implication arising from the facts, that he would deliver the money to the plaintiff, and when he refused to do it the plaintiff could recover upon this express or implied contract, without resorting in any manner to the original contract between himself and another, which in its nature was illegal, but with which the defendant was in no wise concerned.

"*Farmer v. Russell, supra,* is to the same effect. The defendant received the money from a third person to deliver to the plaintiff, and it was held that he was bound to pay it to the plaintiff, although the original consideration upon which the money was to be paid the plaintiff by third person was illegal. Eyre, Chief Justice, said: 'It seems to me that the plaintiff's demand arises simply out of the circumstances of money being put into the defendant's hands to be delivered to him. This creates an *indebitatus,* from which an *assumpsit* in law, arises and on that action on the case may be maintained. * * * The case therefore is brought to this, that the money is got into the hands of a person who was not a party to the contract, who had no pretense to retain it, and to whom the law could not give it by rescinding the contract. Though the court will not suffer a party to demand a sum of money in order to fulfill an illegal contract, yet there is no reason why the money in this case should not be recovered, notwithstanding the original contract was void. The difficulty with me is that the contract with the carrier cannot be connected with the contract between the plaintiff and the man at Portsmouth, and in that view I think the verdict is not to be supported. However, I incline to a new trial on another ground. It does not clearly appear that the defendant was not himself a party to the original contract, for there was a circumstance in the report which gave much countenance to the idea that the carrier knew what he was doing, viz., that he was lending his assistance to an infamous traffic. In that case the rule "*Melior est conditio possidentis,*" will apply, for, if the contract with him be stained by anything illegal, the plaintiff shall not be heard in a court of law.' The verdict in that case had been for the defendant. There was a question in the case whether the defendant was privy to the contract between the plaintiff and the man at Portsmouth. The goods

transported were counterfeit pennies or half-pence, and it was the opinion of Eyre, Chief Justice, that, if the defendant had been privy to the original illegal agreement so that the whole thing was but one transaction, the plaintiff could not have recovered. Mr. Justice Rooke was of the opinion that it was not important whether the defendant were privy or not; that if the contract were illegal the plaintiff could not recover from the defendant in any event. The other two judges were of opinion that, the money having been delivered to the defendant for the purpose of being paid to the plaintiff, the defendant was bound to make such payment without reference to the illegality in the original transaction.

"The difference in the principle upon which a recovery was allowed in these two cases, and that upon which the defense in this case is based, is very clear. In the case before us the cause of action grows directly out of the illegal contract, and if the court distributes the profits it enforces the contract which is illegal; but where A. claims money from B., although due upon an illegal contract, and B. acknowledges the obligation and waives the defense of illegality and pays the money to a third person upon his promise to pay it to A., the third party cannot successfully defend an action by A. to recover the money by alleging that the original contract between A. and B. was illegal. This is the principle decided, and we think correctly decided, in the cases cited. It was certainly no business of the third party to inquire into the reasons which impelled the person to give him the money to pay to the plaintiff. That was a matter between those parties, and, if the party from whom the money was due admitted his indebtedness and chose to pay it, the defendant, who received it upon his promise to pay the plaintiff, would have no possible defense to an action by the plaintiff to compel such payment. Such an action is in no sense founded upon an illegal contract. The matter was closed when the party owing the money under it paid it to a third person to be paid to the plaintiff. The action by the plaintiff in such case is founded upon a new contract upon a totally different consideration and of a perfectly legitimate character.

"The next case cited by complainant as an authority for the maintenance of this action is *Sharp v. Taylor, supra.* It was stated by the chancellor in that case that, where one of two part-

ners has possessed himself of the property of the firm, he could not be allowed to retain it by merely showing that in realizing it some provisions of some act of Parliament had been violated or neglected, or that some provision of a foreign statute relating to the registry of vessels had not been complied with. Lord Chancellor Cottenham, in the course of his opinion, said: 'The violation of law suggested was not any fraud upon the revenue, or omission to pay that which might be due; but, at most, an invasion of a parliamentary provision, supposed to be beneficial to the shipowners of this country—an evil, if any, which must remain the same, whether the freight be divided between Sharp and Taylor, according to their shares, or remain altogether in the hands of Taylor. As between the two, can this supposed evasion of the law be set up as a defense by one party against the otherwise clear title of the other? In this particular suit, can the one tenant in common dispute the title common to both? Can one of two partners possess himself of the property of the firm, and be permitted to retain it, if he can show that, in realizing it, some provision in some act of Parliament has been violated or neglected? Can one of two partners in any import trade defeat the other, by showing that there was some irregularity in passing the goods through the custom house? The answer to this, as to the former case, will be that the transaction alleged to be illegal is completed and closed, and will not be in any manner affected by what the court is asked to do, as between the parties. Do the authorities negative this view of the case? The difference between enforcing illegal contracts and asserting title to money which has arisen from them has been distinctly taken in *Tenant v. Elliott* and *Farmer v. Russell*, and recognized and approved by Sir William Grant in *Thomson v. Thomson*; but the alleged illegality in this case was not in the freight being paid to English subjects claiming as owners of the ship, as in *Campbell v. Innes*, 4 Barn. & Ald. 426. The importation of the goods in a ship American built, and not professing to have any English registry, would not be illegal, and the American owner might assign the freight to any one. Assuming this to be so, I am of opinion that, under the authorities referred to, Taylor, who received the freight on account of himself and Sharp, cannot set up this defense to Sharp's claim. Upon these grounds therefore, independently of the submission in the answer, this part of the decree is, I think, right.'

"These observations show that the judgment did not go upon the illegality arising from a mere violation or neglect of a provision of an act of Parliament relating to vessels, and the agreement was not classed among those contracts which are of such an illegal nature that courts refuse to enforce them.    Some of the observations of the Chancellor, made by way of illustration regarding the rule itself, have been doubted by the English Courts, as in the case of *Sykes v. Beanon, supra,* where Jessel, Master of the Rolls, in holding that an illegal contract could not be enforced by one party to it as against the other, directly or indirectly, said that there were several *dicta* of Lord Cottenham in *Sharp v. Taylor,* which he thought were not good law, and the Master of the Rolls remarked: 'It is no part of a court of justice to aid either in carrying out an illegal contract, or in dividing the proceeds arising from an illegal contract, between the parties to that illegal contract.    In my opinion no action can be maintained for the one purpose more than for the other.'    Continuing, the Master of the Rolls observed: 'Then Lord Cottenham goes on, in *Sharp v. Taylor,* to say:  "Do the authorities negative this view of the case?   The difference between enforcing illegal contracts, and asserting title to money which has arisen from them, is distinctly taken in *Tenant v. Elliott* and *Farmer v. Russell,* and recognized and approved by Sir William Grant in *Thomson v. Thomson."*   Yes; but not in that way. I have already explained what those cases were.   Those were not cases in which one of the two parties to an illegal contract sought to recover from the other a share of the proceeds of the illegal contract.   Then he goes on to distinguish *Sharp v. Taylor* in a way which probably distinguishes it from such cases which would be open to exceptions on the ground of criminality. Those are all the authorities to which I think it necessary to refer.   I think the principle is clear that you cannot directly enforce an illegal contract, and you cannot ask the court to assist you in carrying it out.   You cannot enforce it directly; that is, by claiming damages or compensation for the breach of it, or contribution from the persons making the profits realized from it.'   *Sharp v. Taylor* should not be carried at all beyond the facts of the case as set out in the report.

"In *McBlair v. Gibbs, supra,* the question was in relation to the validity of an assignment by an assignor of his interest in an illegal contract.   The payment of the money arising there-

from had been, subsequently to the assignment, provided for by the party owing it, and the dispute arose between the representatives of the assignor and those of the assignee as to which were entitled to the share originally due to the assignor. It was claimed on the part of the representatives of the assignor that, the original contract being illegal, the sale and assignment of an interest therein from him to the assignee was also illegal, and consequently that such interest, equitable or legal, passed to the assignor's executors. Mr. Justice Nelson, however, in delivering the opinion of the court, said: 'But this position is not maintainable. The transaction, out of which the assignment to Oliver arose, was unaffected by any illegality. The consideration paid was not only legal, but meritorious, the relinquishment of a debt due from Goodwin to him. The assignment was subsequent, collateral to, and wholly independent of, the illegal transactions upon which the principal contract was founded. Oliver (the assignee) was not a party to these transactions, nor in any way connected with them. It may be admitted that even a subsequent collateral contract, if made in aid and in furtherance of the execution of one infected with illegality, partakes of its nature, and is equally in violation of law; but that is not this case. Oliver, by the assignment, simply became owner in the place of Goodwin, and as to any public policy or concern supposed to be involved in the making, or in the fulfillment of such contracts, it was a matter of entire indifference to which it belonged. The assignee took it, liable to any defense, legal or equitable, to which it was subject in the hands of Goodwin. In consequence of the illegality the contract was invalid, and incapable of being enforced in a court of justice. The fulfillment depended altogether upon the voluntary act of Mina, or of those representing him. No obligation existed, except what arose from a sense of honor on the part of those deriving a benefit from the transaction out of which it arose. Its value rested upon this ground, and this alone. The demand was simply a debt of honor; but if the party who might set up the illegality chooses to waive it, and pay the money, he cannot afterwards reclaim it. And, if even the money be paid to a third person for the other party, such third person cannot set up the illegality of the contract on which the payment has been made, and withhold it for himself.' "

The intervener, Coleman, cannot prevail in this case, except by virtue of the partnership agreement between himself

and the defendant Mitchell; and, that being void as against public policy, he was not entitled to prevail in the lower court.

4. But does the fact of the illegality of such partnership agreement preclude the plaintiff in error bank from recovering? Its agreement, at all events, is a collateral one, and in the case of *McMullen v. Hoffman, supra,* that character of a contract in relation to an illegal agreement is adverted to wherein the court said:

"What is meant by a collateral contract, or a cause of action arising therefrom, which does not require reference to the principle illegal contract or transaction, is still further illustated in *Armstrong v. Toler,* 11 Wheat. 258, 6 L. Ed. 468. In the course of his opinion, Mr. Chief Justice Marshall assumed the facts to be that the plaintiff, during a war between this country and Great Britian, contrived a plan for importing goods on his own account from the country of the enemy, and goods were also sent to B. by the same vessel. The plaintiff, at the request of B., became surety for the payment of the duties which accrued on the goods of B., and was compelled to pay them, and the question was whether he could maintain an action on the promise of B. to return this money, and the court held that such an action could be sustained. The court said: 'The case does not suppose A. to be concerned, or in any manner instrumental in promoting the illegal importation of B., but to have been merely engaged himself in a similar illegal transaction, and to have devised the plan for himself, which B. afterwards adopted.' And again: "The question of whether the plaintiff had any interest in the goods of the defendant, or was the contriver of, or concerned in, a scheme to introduce them, or consented to become the consignee of the defendant's goods, with a view to their introduction, were left to the jury. The point of law decided is that a subsequent independent contract, founded on a new consideration, is not contaminated by the illegal importation, although such illegal importation was known to Toler, when the contract was made, provided he was not interested in the goods, and had no previous concern in their importation.' And at page 274 of 11 Wheat. (6 L. Ed. 468): 'In most of the cases cited by the counsel for the plaintiff in error, the suit has been brought by a party to the original transaction, or on a contract so connected with it, as to be inseparable from it. As, where a

vendor in a foreign country packs up goods for the purpose of enabling the vendee to smuggle them; or where a suit is brought on a policy of insurance on an illegal voyage; or on a contract which amounts to maintenance; or on one for the sale of a lottery ticket where such sale is prohibited; or on a bill which is payable in notes issued contrary to law. In these, and in all other similar cases, the consideration of the very contract on which the suit is brought is vicious, and the plaintiff has contributed to the illegal transaction.' The case of *Armstrong v. American Exchange Nat. Bank, supra,* is similar to the cases of *Tenant v. Elliott* and *Farmer v. Russell,* and was decided upon the same principle. Counsel for the complainant also refer to a case where a plaintiff had let his horse to the defendant on Sunday, and the defendant had injured the horse by his recklessness and negligence, and a recovery against him was had for the damages occasioned by such negligence, notwithstanding the illegality of the contract of hiring, because in violation of the law relating to the Sabbath Day. *Hall v. Corcoran,* 107 Mass. 251, 9 Am. Rep. 30. In that case the court held the cause of action was not founded upon the contract, but defendant was held liable by reason of his improper and neglectful conduct in regard to the horse in his possession, and which conduct was a violation of the legal duty he owed to the owner of such horse, irrespective of contract. The case was a clear instance of a proper recovery based upon collateral facts, and not founded upon any original illegal contract."

To the same effect is *Welch v. Wesson,* 6 Gray (Mass.) 505, and *Woodman v. Hubbard,* 25 N. H. 67, 57 Am. Dec. 310.

In the case of *McMullen v. Hoffman, supra,* the court further said:

"We think it clear that these cases cited as authority for a recovery in this case upon the ground of completion of the illegal contract, or of a new contract upon a good consideration, do not touch the case before us, with the possible exception of *Sharpe v. Taylor, supra,* and that case ought not to be extended. In the case at bar the action depends upon the entire contract between the parties, part of which we hold was illegal. The partnership part of the agreement cannot be separated from the rest. The complainant's claim to profit rests upon the entire contract. His right is based upon that which is illegal and ut-

terly void, and he cannot separate his cause of action from the illegal part and claim a recovery upon the written portion providing for and evidencing the partnership.

"We come now to a consideration of the two cases upon which the counsel for the complainant specifically rely for the maintenance of this action. They are *Brooks v. Martin*, 2 Wall 70, 17 L. Ed. 732; and *Planters' Bank v. Union Bank*, 16 Wall. 483, 21 L. Ed. 473. Of the two cases, *Brooks v. Martin* is the more like this one, although the cases are by no means precisely similar. The partnership in that case was stated by the court, in its opinion, to have been really engaged, probably with the full knowledge of all its members, in dealing with soldiers' claims long before any scrip or land warrants were issued by the government and contrary to the ninth section of the act of February 11, 1847 (chapter 8, 9 Stat. 125), providing for the granting of land warrants to be issued to the soldiers. The main object of the ninth section of the act was, as the court stated, to protect the soldiers against improper contracts of the precise character of those shown in the record. It was further said that the traffic for which this partnership was formed was illegal, and that if a soldier who had sold his claim to these partners had refused to perform his contract, or to do any act which was necessary to give them the full benefit of their purchase, no court would have compelled him to do it, or give them any relief against it; or if one of the partners, after the signing of the articles, had said to the other, 'I refuse to proceed with this partnership because the purposes of it are illegal,' the other partner would have been entirely without remedy. And if, on the other hand, one of the partners had said, 'I have bought 100 soldiers' claims, for which I have agreed to pay a certain sum, which I require you to advance, according to your contract,' the other partner might have refused to comply with such demand, and no court would have given either of the partners any remedy for such refusal. The court further stated that, upon the facts existing, all the claims purchased by the partner having been turned into land warrants, and the warrants having been sold or located, and where the purchase of the claims had been made prior to the date of the warrant, assignments having been made by the soldiers, and the portion of the lands located having been sold partly for cash and partly on mortgage, and the assets of the partnership consisting then almost wholly of cash securities

or of lands—all these facts appearing—the partner in whose possession the profits of the partnership were could be compelled to account by the other partner, and that the fact that such partner had given a release procured from him by fraud was no bar to his action for such an accounting.

"This action was sustained upon the theory that the purpose of the partnership agreement had been fully closed and completed, substantially all the profits arising therefrom had been invested in other securities or in lands, and that therefore it did not lie in the mouth of the partner who had by fraudulent means obtained possession and control of these funds to say to the other that the original contract was illegal. The wrong originally done or intended to the soldier had been wiped out by the acts of the soldier and his waiver of any claim by reason of the illegal contract. The transactions which were illegal, the court said, had become accomplished facts, and could not be affected by any action which the court might take. The cases of *Sharp v. Taylor, Tenant v. Elliott, Farmer v. Russell, Thomson v. Thomson,* and *McBlair v. Gibbes,* were cited as authority for the proposition. We have already adverted to each of them, and we admit that it is quite difficult to see how, with the exception of *Sharp v. Taylor,* the principle upon which they were decided could be applied to the case then before the court. There is a difference between the case before us and that of *Brooks v. Martin,* because in the latter case the fact existed that the transactions, in regard to which the cause of action was based, were not fraudulent, and they related in some sense to private matters, while in the case before the court the entire contract was a fraud, and was illegal and related to a public letting by a municipal corporation for work involving a large amount of money, and in which the whole municipality was vitally interested. It may be difficult to base a distinction of principle upon these differences. We do not now decide whether they exist or not. We simply say that, taking that case into due and fair consideration, we will not extend its authority at all beyond the facts therein stated. We think it should control the decision of the case now before us.

"In *Planters' Bank v. Union Bank, supra,* Confederate bonds had been sent by one party to the other for sale, and the bonds had been sold by such party as agent of the plaintiff, and their price paid to such agent of the party selling, and the court held that an action would lie to recover the proceeds of that sale thus

paid to' the plaintiff's agent, although no suit could have been maintained by plaintiff against the purchaser for the purchase price of the bonds, because their sale was an illegal transaction; but, where the purchase price of the bonds was paid, it certainly did not rest with the person who received the money upon an express or implied promise to pay it over to set up the illegality of the original transaction. When the bank received the funds, there was raised an implied promise to pay them to the owner, and a recovery could be sustained upon the same ground taken in *Tenant v. Elliott* and the other cases above mentioned.

"It is impossible to refer to all the cases cited from the various state courts regarding this question. Some of them we should hesitate to follow. The cases we have commented upon we think give no support to the claim that the case now before us forms any exception to the rule which, as we believe, clearly embraced it. We must take the whole agreement, and remember that the action is between the original parties to it; that there is no collateral contract and no new consideration and no liability of a third party. The partnership is but a portion of the whole agreement.

"We must therefore come back to the proposition that to permit a recovery in this case is in substance to enforce an illegal contract, and one which is illegal because it is against public policy to permit it to stand. The court refuses to enforce such a contract, and it permits defendant to set up its illegality, not out of any regard for the defendant who sets it up, but only on account of the public interest. It has often been stated in similar cases that the defense is a very dishonest one, and it lies ill in the mouth of the defendant to allege it, and it is only allowed for public consideration and in order the better to secure the public against dishonest transactions. To refuse to grant either party to an illegal contract judicial aid for the enforcement of his alleged rights under it tends strongly towards reducing the number of such transactions to a minimum. The more plainly parties understand that when they enter into contracts of this nature they place themselves outside the protection of the law, so far as that protection consists in aiding them to enforce such contracts, the less inclined will they be to enter into them. In that way the public secures the benefit of a rigid adherence to the law. Being of the opinion that the contract proved in this case was illegal, in the sense that it was fraudulent, and entered into for

improper purposes, the law will leave the parties as it finds them."

It cannot be successfully urged that the plaintiff bank, on account of advancing this money to the defendant Mitchell, with which he and the intervener, Coleman, might carry out the contract with the government, became a party to the illegal contract between Mitchell and Coleman, to the extent that it cannot maintain this action. There is no proof to show that the plaintiff bank, or any of its officers, knew of the proposed agreement between Coleman and Mitchell, or had any knowledge that any such agreement had been entered into until the day the contract was awarded to Mitchell, or within a day or two thereafter. There is no finding of the referee to show that the bank, or any of its officers, either participated in or furthered the illegal agreement. The finding that both Smith, as president, and Johns, as cashier, knew of the arrangements between Coleman and Mitchell, does not tend to show that they were parties to its execution, nor does it clearly appear from the record that the bank or any of its officers had knowledge of the arrangement as to the secret bidding at any time prior to the time that the money was loaned or advanced upon which this action is based, nor is it contended by counsel that the contract made by Mitchell with the cattlemen was void or against public policy. The Indian agent had awarded the contract to Mitchell, and under the partnership agreement Mitchell and Coleman were to be partners, and the bank furnished them money to tear down the fenecs and to enable them to carry out the terms of the contract between Mitchell and the government. If, upon this state of facts, the plaintiff bank is to be denied the right to recover for money advanced by it, every party would advance or loan money at his peril. Those that desired to secure money to aid in carrying out business enterprises would be embarrassed. Business would be paralyzed, as the rule of presumption *mala fides* would be established.

The proper rule is laid down in the case of *Armstrong v.*

*American Exchange National Bank,* 133 U. S. 433, 10 Sup. Ct. 450, 33 L. Ed. 747, wherein the court said:

"It is not shown, as claimed by the receiver, that in advancing the money to Kershaw & Co. the plaintiff became a participator in an illegal attempt to corner the market or that it had aided in such an attempt by previously advancing money to them upon a part of the wheat as collateral security. Although the plaintiff had advanced money from time to time to them upon wheat as collateral security, there is no evidence that it knew, or had any reason to suspect, that the wheat was purchased in an attempt to corner the market. An obligation will be enforced, though indirectly connected with an illegal transaction, if it is supported by an independent consideration, so that the plaintiff does not require the aid of the illegal transaction to make out his case. *Armstrong v. Toler,* 11 Wheat. 258, 6 L. Ed. 468; *Faikney v. Reynolds,* 4 Burr. 2069; *Petrie v. Hannay,* 3 T. R. 418; *Farmer v. Russell,* 1 Bos. & P. 296; *Planters' Bank v. Union Bank,* 16 Wall. 483, 21 L. Ed. 473; *McBlair v. Gibbes,* 17 How. 232, 236, 15 L. Ed. 132, 133; *Brooks v. Martin,* 2 Wall. 70, 17 L. Ed. 732; *Bly v. Second Nat. Bank,* 79 Pa. 453."

The contract under which the intervener, Coleman, seeks to assert his right for the one-half of the proceeds in the judgment being void, the plaintiff bank, as assignee of Coleman, could have no greater right than the assignor, and on that phase of the case was not entitled to prevail in the lower court; but, as to the money loaned or advanced to Mitchell by the bank, this was not infected by the illegality of the contract between Mitchell and Coleman.

5. The question arises, however, the plaintiff bank being entitled to maintain its action against Mitchell for the money advanced to him to carry out such contract, whether or not the plaintiff in error bank has a prior claim to the proceeds of this judgment to the defendants in error banks.

In the case of *Gillette et al. v. Murphy et al.,* 7 Okla. 91, 54 Pac. 413, the Supreme Court of that territory, in a unanimous opinion, held that "a party buying a chose in action takes it subject to all existing equities, and can acquire no greater interest

therein than his assignor had, at the time of the assignment."
Later, in the case of *Jack v. National Bank of Wichita,* 17 Okla.
430, 89 Pac. 219, in an opinion by Justice Hainer, concurred in
by Justices Gillette, Irwin, Pancoast, and Garber, Chief Justice
Burford and Justice Burwell dissenting, it was held that, where
two assignments of a chose in action, for a valuable consideration,
are made to different persons, the assignee who first gave notice
of his claim to the debtor had the prior right, although the
assignment to him is made subsequent to the time of the assign-
ment to the other assignee, and the case of *Gillette et al. v. Mur-
phy et al.,* in so far as it conflicted with that holding, was over-
ruled. The correctness of the decision in the case of *Jack v.
National Bank of Wichita* is challenged in this court by the plain-
tiff in error, and it is insisted that the rules announced in the
case of *Gillette et al. v. Murphy et al.,* are sound as an entirety
and should not have been overruled in any respect; but we do not
feel that we would be justified by reason in disturbing the ruling
in the latter case. We are unable to discover, however, on what
ground the trial court refused to award a judgment in favor of
the plaintiff, the Citizens' National Bank of Chickasha, against
the defendant E. F. Mitchell, for the balance due on the advance-
ments or loans made to him by said bank, for the jurisdiction of
equity having attached, and the necessary parties being before the
court, all rights connected therewith will be adjudicated. *De
Roberts v. Town of Cross,* 23 Okla. 883, 101 Pac. 1114.

As to the defendants in error the City National Bank of
Lawton and the Merchants' & Planters' Bank of Lawton, the
judgment of the lower court is affirmed. As to the defendant in
error E. F. Mitchell, the judgment of the lower court is reversed,
with instructions to set aside the judgment in favor of said
defendant, and to enter judgment in favor of the plaintiff in
error bank, the Citizens' National Bank of Chickasha, against E.
F. Mitchell in the sum of $1,368, with interest thereon and the

costs of the case.   Let the costs of this appeal be taxed against said defendant in error E. F. Mitchell.

Dunn and Turner, JJ., concur; Kane, C. J., concurs in conclusion; Hayes, J., disqualified and not participating.