## OTTAWA COUNTY NAT. BANK v. BOULDIN et al.

No. 15532—Opinion Filed Dec. 22, 1925.

Rehearing Denied March 30, 1926.

1. **Pleading—Demurrer—Waiver by Pleading Over.**

Where a demurrer to a petition is sustained by the court, and plaintiff asks leave to file and does file an amended petition, he thereby waives the error, if any, in sustaining the demurrer, and the filing of the amended petition is an abandonment of the original petition.

2. **Partnership—Mere Agreement for Relation in Future.**

The law has always treated the partnership relation as founded in voluntary contract. It does not surprise parties into a partnership against their will, and where parties have entered into a contract to become partners at some future time, or upon the happening of some future contingency, they do not become partners until the agreed time has arrived or the contingency has happened. The mere agreement to form a partnership does not of itself create a partnership.

3. **Same—Liabilities as Partner — Burden of Proof.**

Where there is no partnership existing as a matter of law, a defendant cannot be charged as a partner unless his conduct is such as to estop him denying the partnership, and a plaintiff who relies upon such conduct must plead the estoppel, and where one defendant denies he is a member of a partnership, the burden of proof is upon the plaintiff.

4. **Same—Necessity for Allegation in Petition.**

Where plaintiff sues F. R. B. and A. A. B. as individuals, recovery cannot be had against A. A. B. as a partner of F. R. B., in the absence of any allegation in the petition setting up a partnership.

5. **Reformation of Instruments — Option Contract not Reformed to Constitute Sale of Corporate Stock.**

Where F. B. and A. B. sign an agreement drawn in the form of an option contract for the purchase of shares of stock in a corporation, equity will not reform the contract, and convert it into a contract for the pur-

chase and sale outright of such stock, and upon such reformation render judgment against A. B. for the sum at which H. agreed to sell the stock, where there is no evidence tending to prove A. B. had any knowledge of the fact that F. B. and H. had agreed the signed agreement was not to be an option, and in the absence of any evidence tending to prove F. B. was the agent of A. B. or had any authority from A. B. to enter into such a contract.

(Syllabus by Ruth, C.)

Commissioners' Opinion, Division No. 3.

Error from District Court, Ottawa County; J. J. Smith, Judge.

Action by Ottawa County National Bank, as assignee of L. B. Hering, against F. R. Bouldin and A. A. Beard, praying judgment in the sum of $4,975 claimed to be a balance due on 1,000 shares of stock in the Redskin Mining Company, sold by said Hering to defendants. Judgment for plaintiffs against F. R. Bouldin, and judgment for defendant A. A. Beard, and plaintiff appeals from the judgment in favor of Beard. Affirmed.

Marshall W. Hinch and Clyde Morsey, for plaintiff in error.

Y. P. Broome, for defendant in error A. A. Beard.

Opinion by RUTH, C. Plaintiff's petition alleges defendants agreed to purchase from L. B. Hering 1,000 shares of the capital stock of the Redskin Mining Company, for the sum of $5,000, and paid $25 when the agreemnt was signed and agreed to pay the balance in monthly installments, and that Hering duly assigned the contract to plaintiff for a valuable consideration.

Defendant Beard demurred to the petition, which demurrer was by the court sustained, and plaintiff filed its amended petition, wherein it alleges:

"That it was expressly understood by and between Hering and defendants that the transaction was a sale of said stock and not an option to purchase same; * * * that through a mutual mistake in the parties in drafting said written agreement, same was drawn in the form of an option contract, but that said contract was expressly intended to be a contract of sale and not an option for the purchase of said stock."

Plaintiff tenders the stock into court for the benefit of defendants, prays that the contract be reformed, and prays judgment against the defendants in the sum of $4,-975. Plaintiff attaches a copy of the agreement which bears date as of September 15, 1920, the last payment to be made January 1, 1921, and the assignment to plaintiff bears date as of October 14, 1922.

The defendant Bouldin entered no defense, but defaulted. The defendant Beard filed answer consisting of a general denial, and for further answer says that there was no mistake in drafting the contract, but that the contract fully and completely sets out the agreement between the parties. Defendant further alleges that long after the option had expired, and after Hering is alleged to have assigned his contract to plaintiff, and on the 27th day of December, 1922, Hering voted said stock at a stockholders' meeting of the Redskin Mining Company, and voted it in favor of a resolution passed by the stockholders at the meeting, authorizing the transfer of all said Redskin Mining Company's assets to the creditors of the company, and pursuant to said resolution the assets were so transferred and the company wholly divested of all its property and assets, and the said company at this time and at the time of the filing of this action had no property or assets whatever, and at the time of filing this suit the company had ceased to engage in any business, had become dormant, and did not, at the time of the filing of this suit, and does not now, legally exist as a corporate entity. The cause was tried to the court, judgment was rendered against the defendant Bouldin for the sum claimed, and judgment was rendered in favor of the defendant Beard for his cost. From the judgment in favor of Beard, the plaintiff appeals.

The petition tendering the stock into court, praying for reformation of the contract, and praying judgment for the sum alleged to have been agreed to be paid for the stock, presents squarely a petition for specific performance of a contract for the purchase and sale of stock in a corporation, and while this court has passed upon this precise question, we are not called to pass upon it at this time, as the cause was not tried upon that theory in the trial court; the defendant Beard standing squarely upon the contract, as an option contract.

Plaintiff contends: "(1) That the agreement was not an option contract. (2) That this being an equity case, this court will review and weigh the evidence and render such judgment as the trial court should have rendered. (3) That if the court was correct in its conclusion that the contract was drawn in the form of an option, then the instrument should have been reformed as to both defendants."

The court could reach no other conclusion than that the agreement was drawn in the form of an option contract, as the plaintiff specifically alleges in his amended petition

that it was so drawn, but was so drawn through mutual mistake, and the determination of the mutuality depends upon the testimony introduced. A demurrer was sustained to the plaintiff's original petition, and plaintiff asked for and was granted time to amend, thereby waiving any error in the order sustaining the demurrer and abandoning his original petition.

"By making application to amend after a demurrer has been sustained, it is plain that the party intends to waive whatever error there may be, if any exists, in order that he may have the privilege of curing the defect in the original pleading. The filing of an amended pleading is an abandonment of the prior one, and the application to file an amended pleading manifested an intention to abandon the former." Board of Com'rs of Garfield County v. Beauchamp, 18 Okla. 1, 88 Pac. 1124; Berry v. Barton, 12 Okla. 221, 71 Pac. 1074; Morrill v. Casper et al., 13 Okla. 335, 73 Pac. 1102; Rogers v. Brown, 15 Okla. 524, 86 Pac. 443; Carl et al. v. Oklahoma Woolen Mills, 16 Okla. 515, 86 Pac. 66; Cates v. Miles, 67 Okla. 192, 169 Pac. 888; Cabell v. McLish, 61 Okla. 224, 160 Pac. 592; Campbell v. Thornburgh, 57 Okla. 231, 154 Pac. 574; Guess v. Reed, 49 Okla. 124, 152 Pac. 399; Chidsey v. Ellis, 31 Okla. 107, 125 Pac. 464; Pacific Mut. Life Ins. Co. v. O'Neil, 36 Okla. 792, 130 Pac. 270.

The defendant Bouldin was called as a witness for the plaintiff. Bouldin had defaulted in answer, and appeared perfectly satisfied to have judgment rendered against him. We gather from the evidence that Bouldin was not furnishing any money in the deal and Bouldin appeared to be a willing witness for the plaintiff. Bouldin was being sued for $4,975, and testified for plaintiff, and his testimony, summarized, is as follows: Witness saw Hering and asked him if he had any more of the Redskin he wanted to sell; that he thought he could handle it. Hering asked who Bouldin was going to sell it to, as he, Hering, knew Bouldin could not buy it. (Hering evidently knew the financial standing of the man he was dealing with.) Bouldin said he was going to sell it to A. A. Beard. Witness then saw Beard at the Miami Hotel, and told Beard he could get Hering's stock for $5 per share. That they (Bouldin and Beard) would not have to put up any money; that he could "tie up" the Hering stock and they would pool it with their stock, and he (Bouldin) could sell the pooled stock immediately, or in a very short time, and Beard said, "We'll see about it". According to the record, these were the only words spoken by Beard before the contract was entered into. Bouldin then saw Hering. He "thinks" he reported back to Beard, but does not remember what Beard said, but he feels "he would not have made the contract if it had not been satisfactory to Beard." Bouldin had sold some of Hering's Redskin stock to some Vinita people on a commission basis, and Hering was going to pay Bouldin a ten per cent. commission for handling this stock. Bouldin "did not know who was going to put up the money for the purchase of the stock; he expected to turn it so quick that he didn't think any cash would be necessary."

"Q. Didn't you use the same form of contract, now it was understood between you and Mr. Hering and the other parties that was an option in that Vinita case, wasn't it? A. Yes, sir."

Bouldin drew the contracts for Hering, both in the sale of stock to the Vinita people and the Beard deal. The contract drawn in option form, as admitted by the amended petition, was sent to Beard at Tulsa, who signed and returned same to Bouldin at Miami. So far as the record discloses, Bouldin never sold any Redskin stock, or ever attempted to sell it after they had once secured Beard's signature to this agreement. Bouldin never saw Beard after the contract was drawn; never again talked to him about the deal after he had told Beard at the Miami Hotel that he could "tie up" the Hering stock and Beard told him to "see about it." From reading the record it appears Hering did not forward the notes, mentioned in the agreement for deferred payments, to Beard until after they had secured Beard's signature to the agreement. Neither Hering, who was connected with the Miami Trust & Savings Bank, nor the cashier of the plaintiff bank, who testified at the trial, ever asked Bouldin to sign the notes or pay the money for the stock, notwithstanding the agreement ran to F. R. Bouldin and A. A. Beard, and was signed by them individually. Hering testified he never talked to Beard about the deal, and after the contract was signed and returned and the notes sent to Beard for execution, and when the notes were not returned, Hering saw Beard in Miami and asked him about the notes, and he "thinks" Beard said he would sign them. A. A. Beard corroborates Bouldin to this extent: Bouldin came to Beard, and talked of pooling Beard's stock and Bouldin's stock, and said he could get certain stock from Hering and could "get it blocked up" and sell it; that he could "tie up" the Hering stock and "turn" the block so they would not have to put up any money, and Beard said, "Go ahead and see what you can do." Beard further testified he met Hering about three weeks after the notes were forwarded him

(Beard had returned the notes to Bouldin), and Hering asked him about the notes, and Beard replied that as Bouldin had not made any headway about selling the stock, he did not care to go any further with the matter, and though he saw Hering frequently, nothing further was said about the deal until this action was filed, more than two years after the agreement was signed.

It is further disclosed by the evidence that Hering, who was a director of the Redskin Mining Company, had deposited this stock with the plaintiff bank, and the plaintiff had never requested payment from Hering on the loan for which the stock was collateral, and never requested payment from Bouldin. It appears all parties were looking to Beard and to him alone. We then find Hering as director and stockholder in the Redskin Company, voting this stock as his own, two years and three months after the agreement had been signed by Beard, and Hering voted his stock in favor of a resolution passed at the stockholders' meeting in December, 1922, authorizing the transfer of all the property and assets of the Redskin Company to the creditors of the company, and the transfer was consummated, and Hering by his own act assisted in making his stock worthless, as the Redskin Company ceased to exist, and Hering was in a position to deliver to Beard nothing but a worthless scrap of paper. There was no evidence that Beard ever considered he was buying the stock when he signed the agreement in the form of an option, or that he ever spoke a word in reference thereto except "Well, see what you can do about it," in response to Bouldin's statement that he could tie up Hering's stock—"block up" all the stock and sell it without putting up any money. All the testimony was in favor of Beard, and amply sustains the judgment of the court on this point.

Plaintiff next contends that Bouldin and Beard were partners, and as Bouldin knew it was not an option, and as Bouldin signed the agreement, even though he signed it as an individual, it bound the partnership. In the petition the defendants are sued as individuals. In the brief an effort is made to establish a partnership and bind Beard by the acts of Bouldin, for the reason that the evidence disclosed that if Bouldin did succeed in "blocking up" three holdings of stock and succeeded in selling the same, Bouldin and Beard would split the profits, if any, "fifty-fifty." In the reply of plaintiff it is said:

"We think the evidence sufficiently shows that a partnership existed between Bouldin and Beard, and Beard authorized Bouldin to go to Hering and purchase his stock; or if it was not a partnership, that Beard authorized Bouldin to act as agent to make a contract for the purchase of the Hering stock, but, if no partnership existed, and Beard did not authorize Bouldin to purchase, the facts are ample to justify Hering in believing that Bouldin was clothed with power and authority to buy his stock. Bouldin informed Hering that he was authorized to buy the stock and Beard was his principal. * * * Under these facts, we repeat that Beard, who authorized Bouldin to make some kind of a contract with Hering, should be held responsible even though Bouldin exceeded any authority that was granted him by Beard."

Again, to quote from plaintiff's reply brief:

"When Bouldin informed Beard that he had previously held an option on Hering's stock and knew from his previous experience that Hering would be willing to sell, and that with the stock of Hering they could create a large block of pooled stock, for the sale of which Bouldin had in view some outside party, the act of Beard, if not his exact language, was sufficient authority for Bouldin to go ahead and negotiate with Hering for the purchase of the stock. Whether it was authority to purchase or not is of no consequence. It is important that it created the relation of principal and agent. Therefore, when the minds of Bouldin and Hering met in agreement on the sale of stock, it was a meeting of the minds of Hering and Beard."

Again, the plaintiff says:

"The contract as written constitutes a valid agreement which by its terms is binding on both parties and should be enforced without reformation. * * * It needs no reformation."

And in the next breath it says:

"Even though this court could say the contract is an option as drafted, every fact and circumstance points to the right to have it reformed."

Certain it is the court did not err in finding the contract was an option in form, as it was so alleged in the plaintiff's amended petition, and whether plaintiff wants it reformed as to Beard or enforced as to Beard unreformed, we cannot gather from the brief. Certain it is plaintiff wants judgment against Beard, and cares little about judgment against anyone else.

Whether plaintiff wants judgment against Beard as an individual, as a partner of Bouldin, or as principal with Bouldin as his agent, we are at a loss to know, as its brief asks for it in any one of the three capacities

Plaintiff cannot maintain its contention

of partnership, or that Bouldin was the agent of Beard with authority to purchase the stock. Its own evidence disproves its contention. When Bouldin, who had formerly handled or sold Redskin stock for Hering on commission, approached Hering and told him he could handle some more of his stock. Hering said: "I know you can't buy the stock; who are you going to sell it to?" And when Bouldin said he was going to sell it to Beard, Hering agreed to give Bouldin a ten per cent. commission, as he had done on a previous occasion, for handling the stock. If plaintiff's own evidence proves any agency, it proves Bouldin was the agent of Hering for the sale of the stock. Furthermore, it would be a fraud perpetrated upon a partner, to offer a commission to one partner for effecting a sale of stock to the partnership. We can find no evidence tending to prove a partnership. True it is, that testimony was introduced to the effect that the profits from the sale of the "pooled" stock were to be divided "fifty-fifty" (to use the words of Bouldin) between Bouldin and Beard. This understanding depended upon a contingency, to wit, that if Bouldin could control the Hering stock, Bouldin would put in the "pool" the small amount of stock he owned, and agreed with Beard that if he (Beard) would "pool" his stock, Bouldin would "block up" the stock and sell it and Beard was to receive one-half of the profits in consideration of Beard's putting his stock into the "pool" and permitting Bouldin to handle it.

In 30 Cyc. 352, it is said:

"Our law has always treated the partnership relation as founded in voluntary contract. It does not surprise parties into a partnership against their will."

At page 358, it is further said:

"Persons who have entered into a contract to become partners at some future time, or upon the happening of some future contingency, do not become partners until the agreed time has arrived, or the contingency has happened. * * * The mere agreement to form a partnership does not of itself create a partnership."

See, also, 20 R. C. L. 811, where it is said:

"A marked distinction exists in law between an agreement to enter into a copartnership relation at a future day, and a copartnership actually consummated. * * * An executory contract does not create a partnership. The contract must be executed, and the partnership actually 'launched.'" Dow v. State Bank, etc. (Minn.) 93 N. W. 121.

See, also, Dale v. Simon (Tex. Civ. App.) 248 S. W. 703; Barker v. Pullman Co. (C.

C.) 124 Fed. 555, 134 Fed. 70, 67 C. C. A. 196.

In Champion v. Wilson & Company, 64 Ga. 191, the court held:

"Champion was not sued as a partner, but individually, and there could not be a legal recovery against him as a partner. It matters not that the others who were alleged to be his partners were bankrupt, and that recovery would come out of him in any event. The plaintiff must sue him as he contracted with them and recover accordingly."

In the instant case plaintiff sued Beard individually and not as a partner, and this court held in King v. Timmons, 23 Okla. 407, 100 Pac. 536:

"A party being sued, not as a partner, but individually, it is error to permit a recovery against him as a partner, where objection is timely made on that ground."

"Where there is no partnership existing as a matter of law, a defendant cannot be charged as a partner unless his conduct is such as to estop him from denying the partnership; and a plaintiff, who relies upon such conduct, must plead the estoppel." McKallip v. Geese, 30 Okla. 33, 118 Pac. 586.

"Where one denies he is a member of a partnership, the burden is upon the party alleging the partnership, and this is a question of fact for determination by the jury." Moning Dry Goods Co. v. Wiseman, 60 Okla. 94, 159 Pac. 259.

Finding no error in the record, the judgment of the trial court is affirmed.

By the Court: It is so ordered.

Note.—See under (1) 3 C. J. p. 668, § 539; 31 Cyc. p. 465. (2) 30 Cyc. pp. 352, 358, 359; anno. 18 L. R. A. (N. S.) 1101; 20 R. C. L. p. 811; 5 R. C. L. Supp. p. 1127. (3) 30 Cyc. p. 403; 20 R. C. L. p. 849; 4 R. C. L. Supp. p. 1380. (4) 30 Cyc. p. 581; 20 R. C. L. p. 939; 4 R. C. L. Supp. p. 1394. (5) 34 Cyc. p. 984.