## HUGHES v. BAKER et al.

No. 22172.    Sept. 18, 1934.

Rehearing Denied Oct. 23, 1934.

partners; that the purpose of the partnership was to construct and develop a country club; that the contract for the labor was made with Edgar Barber, as one of the partners, to prosecute the partnership enterprise.

R. E. List, Rounds & Porter Lumber Company, H. D. Morgan, T. C. Hughes, and Hattie M. Hughes deny specifically the partnership and generally plaintiff's allegations, all by verified answers.

Hattie M. Hughes also files her cross-petition in which she alleges: That she is the owner of the 80 acres of land involved; that at all of the times complained of, H. D. Morgan, R. E. List, and A. F. Mowry were partners as the Castlewood Construction Company; that the Castlewood Country Club is a corporation; that said partnership entered into a joint adventure of promoting a country club and making improvements therefor; that the costs of these improvements were to be paid from the proceeds of the sale of memberships to the club.

That said partnership verbally agreed to buy said land for the sum of $4,000; that cross-petitioner made and placed a deed thereto in escrow to be delivered on payment of said sum of money within six months; that extensions of this time were made, the last of which expired July 15, 1929; that said firm failed to pay said sum within said time, and that cross-petitioner withdrew said deed.

That said firm, on October 25, 1928, made a written contract with J. E. Barber, referred to as Edgar Barber, for the making and completion of all the construction work and improvements for a country club; that subcontracts were made for portions of this work.

That the improvements were completed and transferred to and accepted by the Castlewood Country Club in consideration of capital stock in the said corporation, which was issued and delivered to J. E. Barber, H. D. Morgan, and R. E. List, and accepted by them.

That prior to the time of the completion of the improvements, plaintiff accepted payment from the said Barber as said Barber could collect club membership notes held by him; that said notes have not been paid and that the contract price is not due.

Unverified replies were filed to this answer and cross-petition.

Edgar Barber filed his verified answer

Joe T. Dewberry, for plaintiff in error.

McCollum & McCollum, for defendants in error Rounds & Porter Lumber Company, H. D. Morgan, and R. E. List.

L. N. Kimrey, for defendant in error John Baker.

Q. L. Dickerson, for defendant in error Edgar Barber.

PER CURIAM. There are 187 pages of pleadings and exhibits attached thereto in the case-made in this case. In brief they are in substance as follows: John Baker filed his petition in cause 7649 on account and for the foreclosure of a laborer's lien of himself and liens of others assigned to to him, which liens are claimed against the land involved herein. He alleges that Hattie M. Hughes, T. C. Hughes, Edgar Barber, H. D. Morgan, and R. E. List were

to the cross-petition and admits the corporate existence of the Castlewood Country Club; denies the copartnership and the allegations generally; admits the employment of the laborers, and adopts a large part of the cross-petition of Hattie M. Hughes as a part of his answer. He also pleads the agreement to accept the proceeds of club membership notes for labor and that the notes have not been paid and that the price is therefore not due.

Rounds & Porter Lumber Company filed its petition in cause 7666 on account and for the foreclosure of a lien for material furnished for said enterprise. That for money consideration in excess of the market value thereof, Hattie M. Hughes was to deed the land and that the partners, alleged in cause 7649 to exist, were to furnish the buildings and necessary improvements; that interests in the country club were to be sold for $200 per share, from the proceeds of the sale of which the land and improvements were to be paid for, and that the excess of such proceeds over the costs was to be profits to the three partners and the excess of the market value of the land the profits to accrue to Hattie M. Hughes. That when the project was completed it was to be turned over to the Castlewood Country Club. It further alleges similar to the allegations in the petition in cause 7649.

H. D. Morgan filed his answer admitting a large part of the allegations in the petition, and sets up his lien and asks for judgment on account and the foreclosure of his lien.

The Hughes filed their verified general denial and specific denial of the partnership. Hattie M. Hughes filed her cross-petition, alleging substantially the same as in her cross-petition in cause 7649.

Unverified replies were filed to this cross-petition.

These two actions were consolidated and a trial resulted in a finding that Hattie M. Hughes was a member of the joint adventure, and judgment rendered on account against her and the three others held to compose the members of the joint adventure, and a decree was made establishing the liens, the foreclosure thereof, and for the sale of the property to satisfy the judgments.

Hattie M. Hughes brings the case to this court and makes 16 assignments of error. There are a number of errors of law assigned, some of them technical, but we prefer to dispose of the case on its merits.

She contends, among other things, that under the facts alleged she was not a member of the joint adventure, for the reason that under the allegations there was no such community of interest in the business as the law requires to constitute her a member of the partnership or joint adventure, and for the further reason that there is no evidence on which to base a judgment or decree against her, and, also, that, as her allegations of partnership were not denied under oath, such allegations are taken and confessed as true.

The first paragraph of the brief of the defendants in error states: "The only question in this case is, whether plaintiff in error, Hattie M. Hughes, entered into a joint adventure with R. E. List, H. D. Morgan, A. F. Mowry, and Edgar Barber, to promote a certain country club. If she did, the judgment of the trial court should be sustained. If she did not, the judgment of the trial court should be reversed."

The defendants in error contend that, though the parties were partners as alleged by plaintiff in error, they were partners for the purpose of making the necessary improvements, and that Mrs. Hughes' performance and interest in the partnership was to furnish the land and enjoy the excess of profits above its market value.

The defendants in error, on page 12 of their brief, assume that "This is a suit at law and a jury case." On page 2 of the reply brief of plaintiff in error, it is stated that "These were equity actions," and that we "shall not burden the court with a reiteration of authority contained in our former brief." We cannot find, however, that we have been favored by either side with authorities on this question. The point becomes important to determine whether or not the court may weigh the evidence and determine the facts in issue.

Whether a proceeding to foreclose a mechanic's or materialman's lien is a legal or equitable one has been decided variously in the different jurisdictions, depending largely on the wording of the statute of each state. Section 7478, C. O. S. 1921, provides for their enforcement by a civil action in the district court, and, further, that "the practice, pleading, and proceedings in such action shall conform to the rules prescribed by the Code of Civil Procedure as far as the same may be applicable." Under our Code the blended practice prevails—that is to say, there is no distinction between actions at law and suits in equity. Section 178, C. O. S. 1921.

In those states where the amalgamated practice prevails, as in Oklahoma, such actions are essentially of an equitable nature and are governed by the rules of equity practice. Jones b. Balsley & Rogers, 27 Okla. 220, 111 P. 944; Miller v. Carlisle, 127 Cal. 327, 59 P. 785; Curnow v. Happy Valley Blue G. & H. M. Co.. 68 Cal. 262, 9 P. 149; Goldtree v. City of San Diego, 8 Cal. App. 505, 97 P. 217; Selfridge v. Leonard Heffner Co., 51 Colo. 314. 117 P. 158; Jensen v. Bumgarner (Idaho) 137 P. 529; Elder Merc. Co. v. Ottawa Inv. Co.. 100 Kan. 597, 165 P. 282; Powell v. Nolan (Wash.) 67 P. 712, 68 P. 389; Wheeler v. Ralph (Wash.) 30 P. 714.

There are other authorities from the same and other states, but these will be sufficient to sustain the proposition.

It is clear that, while these liens are created by law, yet a foreclosure results in the establishment of the lien, a decree for the sale of the property, and the distribution of the proceeds of the sale, and such a proceeding therefore calls on the equity powers of the court, and is one cognizable in equity, and may be termed a statutory proceeding of an equitable nature.

When a court with our blended practice acquires jurisdiction of a cause, legal or equitable in its nature, it also has jurisdiction to determine all the rights of the parties growing out of the controversy, whether at law or in equity.

The debt created by furnishing the labor or material for the improvements is distinct in the sense that this part of the action is for the recovery of money. Though the establishment of the lien may fail. the court will proceed with the case to a final determination of the same on the debt. In other words, the pleadings invoke the jurisdiction of the court, first, for judgment for the debt; second, for a decree establishing and enforcing the lien. If the first relief fails, then necessarily both fail. Judgment may in a proper case be recovered for the debt and the second relief demanded be denied. Judgment and decree may be given in one or both instances. Relief therefore may be granted or denied in one or both instances, as the facts and circumstances warrant. Okmulgee Prod. & Ref. Co. v. Baugh, 111 Okla. 203, 239 P. 900.

This court has held that in an action to foreclose a laborer's lien and for judgment on the account, if an issue is joined as to the amount due, either party is entitled, as a matter of right, to a trial by a jury.

Scott v. Jones Everett Mach. Co., 82 Okla. 255, 200 P. 168.

The foreclosure part of the suit is accordingly one in equity, while that part for recovery of judgment for the debt is at law.

In an action of equitable cognizance, this court, upon appeal, will weigh the evidence and render such judgment as should have been rendered by the trial court (Elling v. Kohler, 150 Okla. 129, 3 P. (2d) 164), while a verdict in a law action will not be disturbed on appeal if supported by any competent substantial evidence reasonably supporting the verdict (Wittman v. Moll, 131 Okla. 210, 268 P. 243; Standfield v. Lincoln, 150 Okla. 289, 1 P. (2d) 387, and others). This rule is applied also if a jury is waived and the cause tried to the court (Ward v. Feldman, 122 Okla. 176, 253 P. 51; Prudential Ins. Co. v. Ward, 135 Okla. 117, 274 P. 648).

After weighing the evidence the court finds that the decree of the trial court establishing and foreclosing the mechanic's and materialman's liens is contrary to the weight of the evidence, and the same is reversed.

Is the judgment for the debt supported by any competent substantial evidence reasonably tending to support the verdict?

That the agency of one spouse for the other will not be presumed from the fact of the marital relation alone is supported by 6 Ency. Ev. 807, and a long line of decisions. That is the rule adopted here. The burden was therefore on the defendants in error to establish the agency, if any, of Mr. Hughes for his wife; also to establish her connection with the alleged joint adventure. Whether or not this burden has been sustained leads us to an examination of the evidence.

All the evidence, for the consideration of the court, most favorable to the defendants in error, on the question of whether or not Mrs. Hughes was a member of the joint adventure, is substantially this: Hattie M. Hughes, hereinafter referred to as Mrs. Hughes, is, and for about 30 years has been, the owner of the 80 acres of land involved. T. C. Hughes, hereinafter referred to as Mr. Hughes, is her husband, and for 30 years or more has been in the business of civil engineering. As long ago as 1923 and 1924 Mr. Hughes had in mind the promotion of a country club on this land and had blue prints for the work,

and submitted them for the consideration of a proposed promoter.

A. F. Mowry and R. E. List went to Mr. Hughes' office in Tulsa, in the last venture, to see about the proposition of establishing this country club. Mr. Hughes tried to interest them in promoting the enterprise. Frequent visits were made to Mr. Hughes' office to work out an organization, handle the membership notes, and finance and complete the project. A deed was made by Mr. and Mrs. Hughes conveying the land, and deposited by Mr. Hughes in escrow in the First National Bank of Cleveland to be delivered on payment of $4,000 cash. A second deed was made and placed in the same bank on the same condition in which a tract of one acre was reserved, situate on a proposed lake. This deed was left in escrow until about October 5, 1929. In a general way the enterprise was to be financed by selling 200 memberships at $200 each. Notes were to be taken for these memberships, payable when the project was completed. Some memberships were sold and notes taken. The improvements were to be paid for out of the proceeds of the sale of memberships. The Castlewood Construction Company was formed and composed of R. E. List, H. D. Morgan, and A. F. Mowry, and the Castlewood Country Club, a corporation, was organized. When the improvements were all made the completed project was to be turned over to the country club, and certificates of stock in the corporation were to be issued for each $200 membership subscribed.

Mr. Hughes was present and participated in the making of these plans. He said that if these plans were carried out, "We could all make some money out of it." Mr. Hughes had engineered several other similar projects, and with two members of the construction company went to Cleveland and explained the proposition at a business men's luncheon. Mr. Hughes was to act as engineer of the project, for which he was to receive $500. Mr. Hughes also advertised for a stock salesman and assisted in his employment.

Mr. List testified that at one of the conferences Mrs. Hughes was present and said she thought it would be a very nice thing, and if every one would work together it could easily be put over, and, further, that it was stated in her presence that if the property were improved in the manner proposed, "we could all make some money out of it."

Under date of June 26, 1928, the said List, Morgan, and Mowry entered into a written contract whereby they became partners as the Castlewood Construction Company, in the joint venture of constructing said improvements, consisting, among other things, of a lake, bathing pavilion, clubhouse, golf links, etc., per plans and specifications. This contract provides that the expenses thereof shall be borne by the parties in equal proportion; that such expenses shall be paid from the proceeds of the sale of memberships; that when the work is completed the same shall be turned over to the corporation club, and that all profits or losses shall be divided among them.

Under date of October 25, 1928, the Castlewood Construction Company made a written contract with the Barber Construction Company, composed of J. E. Barber, by which said Castlewood Company "transferred and assigned all its right, title, and interest, property, rights, contracts, and proposed construction of the Castlewood Country Club, including all of moneys and the notes heretofore paid or made for membership in said Castlewood Country Club, and all future moneys or notes which may hereafter be made or paid in for memberships in said proposed country club; except as hereinafter expressly provided." In consideration of this the Barber Company agreed to perform the proposed work under the supervision and direction of the Hughes Engineering Company of Tulsa. The Castlewood Construction Company agreed to furnish a certain number of club memberships and to help and assist in selling a certain number of others. Each party was to receive a certain number of memberships free.

Certain parts of the work were later sublet to different members of the Castlewood Construction Company.

The contract was let to Baker because the former contractors concluded they could not do the work and had to abandon it.

The work then proceeded, progressed, and was completed, as one of the witnesses stated, "all but paying for." An opening was had before the dam went out and Mr. and Mrs. Hughes were present. There was to be a celebration on the 4th, but the dam went out on the night of the 3rd, as did also all the enthusiasm of the promoters. The cost of replacing the dam was estimated at $2,500. The entire project was abandoned; and notes could not be collected. In the meantime, sales did not seem to come up to expectation, and Mr. Hughes agreed that if they would pay $4,000 and

take up the deed, he would subscribe for five shares of stock.

Mr. List testified that Mrs. Hughes stated that she and Mr. Hughes valued the land at $1,500, and that they could get more out of it by putting this project over, and Mrs. List testified that Mrs. Hughes said she could not get more than $1,500 for the land as it stood, and she would put it in to have this project put over.

Mrs. Hughes was on the premises at least on two occasions when the work was being done, on one of which occasions the lake was full of water and it looked as if a big rain were coming and two witnesses testified in effect that she asked Mr. Baker if he could "plow some furrows through that spillway and save the water from going over the dam," and "Mr. Baker, whatever you do, save that dike."

David Holler, the only witness besides Mr. Hughes who testified as to the value of the land, said $150 per acre would be a high price for it for agricultural purposes; that if it had been leased for oil purposes for two successive five-year terms for $1,000, he would judge it to be worth $50 per acre, "or something like that."

This, in substance, is all the evidence which in any way tends to connect Mrs. Hughes with the joint adventure.

The uncontradicted evidence also shows that Mrs. Hughes received $1,000 bonus, and $20 per month, for one five-year period, for an oil lease on this land, and a $500 bonus and $80 per year for another period, which brings the value of the land to the approximate sum testified to by Mr. Holler; and that 12 years ago she was offered $45 per acre for the fee. That the land has been offered for sale several times, but never for less than $4,000; that the land has produced an income of $4,000 in the past ten years.

Mrs. Hughes admitted seeing the improvements beng made. She said she knew it "was quite a project that was going on up there." She said that she was there and saw it—stood on the bank; saw the clubhouse going up; saw a hole in the ground; that "they took out the whole bottom of my farm"; that she understood it was going to be a lake; that it covered 35 acres; that she does not know how many acres they scooped out of the bottom; that she did not know they were cutting down all of her trees; that she knew Mr. Hughes was doing the engineering work.

It is uncontradicted that Mr. Hughes made the talk before the business men's luncheon club at Cleveland at the request of Mr. Morgan, Mr. List, and Mr. Mowry; that it is customary for engineers to do this in such events, and, also, if required, to assist in interesting contractors in the proposition.

It is unfortunate that the materials furnished are largely cement and brick and that the improvements cannot be removed without wrecking them; unfortunate also that the land has probably been ruined for agricultural purposes. However, we must decide the case according to legal principles.

Mrs. Hughes was to receive the purchase price after the project was completed. It does not seem strange that she would want to see the work expedited, nor that she, as anyone else, would be interested in having the dam protected and saved.

Land that will produce a $4,000 income in ten years should be worth $4,000, as testified, in substance, by Mr. Holler, that it was worth.

As stated, the conscience of the court will not permit the establishment and foreclosure of the lien. Mrs. Hughes did not say or do, or refrain from saying or doing anything on which anyone relied which estops her to deny her partnership. Nor is there any substantial evidence reasonably tending to connect her with the joint adventure, for which reason the judgment should be reversed.

The question of whether or not, under the alleged and admitted facts, Mrs. Hughes can be held as a matter of law to be a member of the joint adventure we deem to be of such interest that we feel it advisable, while the question is before us, to determine the same.

The plaintiff in error contends that there is no such a community of interest in the company and the profits as the law requires to constitute a partnership.

The defendants in error contend that, while there is no direct positive written or oral evidence of Mrs. Hughes' membership in the joint adventure, it is established from the purpose of the enterprise, by the acts and conduct of the parties in relation to the engagement, and all the facts and circumstances surrounding the transactions, **and the inferences to be drawn therefrom,** and what third persons had the right to believe therefrom, as affecting them, that

the inevitable conclusion is that Mrs. Hughes is such a member.

Section 8128, C. O. S. 1921, provides that:

"Any one permitting himself to be represented as a partner, general or special, is liable as such to third persons to whom such representation is communicated, who on the faith thereof give credit to the partnership."

The next section provides that:

"No one is liable as a partner who is not such in fact, except as provided in the last section."

One may, however, if his acts, speech or conduct, or his failure to speak or act when he should have done so, misleads third persons who rely thereon, be estopped to deny the partnership.

The question of estoppel is briefed by plaintiff in error, but is not pleaded by any one below, so we cannot review that question. Clem Oil Co. v. Oliver, 106 Okla. 22, 232 P. 942, and Oklahoma cases therein cited. Ottawa Co. Natl. Bank v. Bouldin, 117 Okla. 104, 246 P. 434.

Defendants in error, on page 27 of their brief, state the question of estoppel is all beside the mark. So that question, and of holding out, is not in the case.

We recognize the fact there is a difference in determining what is a partnership as between the members thereof and as between them and third persons whose rights have intervened.

Persons, although not partners as between themselves, may occupy a position which renders them liable to third persons as such. This is usually done because of a holding out or on the doctrine of estoppel, neither of which questions is involved in this case.

It is stated in 30 Cyc. 383, that:

"When third persons have not been misled by the language or conduct of parties to an agreement, the question whether such an agreement constitutes a partnership ought to be determined by the intention of the contracting parties, as that is disclosed by all the terms of the agreement and the parties' conduct."

As stated by the defendants in error, a partnership may, under proper facts and circumstances, "be inferred from the purpose of the enterprise and the acts and conduct of the parties in relation to the engagement." O. K. Boiler & Welding Co. v. Minnetonka Lumber Co., 103 Okla. 226, 229 P. 1045.

Under the Uniform Partnership Law, except as provided by the provisions of the same law as to partnerships by estoppel, persons who are not partners as to each other are not partners as to third persons. 47 C. J. 687. On the same page it is stated that, "except by those authorities which recognize the existence of a partnership by construction of law, persons who are not partners as between themselves will not be held partners as to third persons in the absence of some element creating a partnership by estoppel or holding out." In support of this last clause are cited, among others: Quadrangle Petroleum Co. v. Kendrick, etc., Lumber Co., 120 Okla. 246, 249 P. 910; Ottawa Co. Natl. Bank v. Bouldin, 117 Okla. 104, 246 P. 434; Gwinup v. Walton Trust Co., 69 Okla. 319, 172 P. 936.

"The modern rule being that a partnership can never arise solely by operation of law, and that, in order that persons between whom there is no actual partnership may be held liable as partners to third persons, they must have held themselves out as partners and thereby misled third person to an extent such as to create an estoppel against them." 47 C. J. 691.

In a case in which the question of the existence of a partnership as between one of the partners and third person was before this court for determination, it is stated:

"A partnership exists as a result of a voluntary contract between the parties and never solely by operation of law (citing authorities). It is a relation arising out of a contract to do certain things, and exists only where the parties intend to enter into a contract of partnership, and, unless they have estopped themselves by holding themselves out to the world as partners, their intention as derived from the contract is decisive of the question."

The contract was held to contain the essential elements of a contract, but was held void because its purpose was contrary to public policy. Citizens National Bank v. Mitchell, 24 Okla. 488, 103 P. 720.

If the agreement as made and carried out by the parties creates no community of interest in the business carried on, and no division of the profits of a joint concern, there is no basis for the inference of a partnership, in the absence of estoppel.

We do not assume to cite here all the authorities supporting this proposition, but, in addition to what already has been said, the foregoing may be deduced from Sutton v. Schaff (Kan.) 178 P. 418; Beecher v. Bush, 45 Mich. 188; In re Baldwin, 170 N. Y. 156, 63 N. E. 62; Moore v. Williams, 31 Tex.

Civ. App. 287, 72 S. W. 222; Mayo v. Moritz, 151 Mass. 481, 24 N. E. 1083; Aetna Ins. Co. v. Bank of Wilcox, 48 Neb. 544, 67 N. W. 449.

In St. Louis & S. F. R. Co. v. Bell, 58 Okla. 84, 159 P. 336, it is stated that:

"* * * Unless there be a community of interest in the objects or purposes of the undertaking, and an equal right to direct and govern the movements and conduct of each other with respect thereto," there is no joint enterprise. "Each must have some voice and right to be heard in its control and management."

It is stated in Municipal Paving Co. v. Herring, 50 Okla. 470, 150 P. 1067, that:

"If the interest in the profits is joint, then that generally makes it a partnership, but a common interest in the profit does not. If the interest in the profits is that of an owner, if there be a joint seizure, if the parties each have the right, as such owners, to dispose of the profits, then there is a partnership. If one may dispose of or control the profits as much as the other, then there is a joint interest, but if the plaintiff's interest be only a common interest in the profits, that is, if he have no title jointly with the company with the right to control as owner over the profits, but with only a common interest in them because the profits measure what amount he shall receive for the asphalt taken from his mine, then he is not a partner."

This doctrine finds support in section 62, 47 C. J. 669.

In this case the interest in the profits is not that of an owner; there is no joint seizure of the profits. Mrs. Hughes has no right, such as an owner, to dispose of the profits of the enterprise. She cannot dispose of or control the profits of the enterprise as the partners named in the contract might do. The only interest she has in the profits, if any, is the excess, if any, of the purchase price of the land over its fair cash market value, and the value of the acre reserved in the deed, and the partners named in the contract have no interest or control over this, so there is no joint title and seizure with the right to control as owner over the profits.

We think no case can be found in which any court has assumed to hold, even as to third persons, that two or more persons were copartners when their agreement, their acts, conduct, and declarations, and the nature of their engagement and the manner in which it was carried out disclose that, as a matter of law, there can be no partnership, because of the absence of some necessary legal element, unless there are equitable grounds of estoppel.

Taking the most favorable view possible of the evidence for the defendants in error, there being no partnership between Mrs. Hughes and the promoters, and the acts and conduct of the parties in relation to the enterprise, the agreement as made and carried out by them cannot, as a matter of law, constitute a partnership; and there being no question of a holding out or estoppel of any kind, there was no partnership as to third persons. There being no partnership as to any one, the judgment of the lower court is reversed and set aside as to Mrs. Hughes, and the cause is remanded to the lower court for proceedings in accordance herewith.

What we have said disposes of the case, and we therefore deem it unnecessary to consider any of the other assignments of error made by the plaintiff in error.

The Supreme Court acknowledges the aid of District Judge Arthur G. Sutton, who assisted in the preparation of this opinion. The District Judge's anaylsis of law and facts was assigned to a Justice of this court for examination and report. Thereafter the opinion as written was adopted by the court.